ERNEST E. JOHNSON, III and )
BRIAN S. PRINDLE, )
                                       )
          Plaintiffs, )
                                       )
        v. )          2:10-cv-00442-JAW
                                       )
VCG HOLDING CORPORATION, )
                                       )
        Defendant. )

## ORDER ON MOTION FOR CERTIFICATION OF COLLECTIVE ACTION

In this Fair Labor Standards Act (FLSA) and Maine Overtime Law case, the named Plaintiffs move for conditional class certification of their FLSA claim. The Court dismisses the motion without prejudice because the Plaintiffs failed to demonstrate that there exist other similarly situated employees interested in joining the action as class members.

## I.     STATEMENT OF FACTS

### A.     Procedural History

On October 27, 2010, Ernest Johnson, III and Brian Prindle initiated "an individual and collective action" on behalf of "all persons who are or have been employed by defendant VCG Holding Corporation . . . as disk jockeys at any time within [the previous] three years . . . through the date of the final disposition of this

action." *Compl.* at 1–2 (Docket # 1).[1] Individually and on behalf of proposed members of the collective action, the Plaintiffs allege that VCG violated the Fair Labor Standards Act, 29 U.S.C. § 201 et seq. (Count I), and individually, they allege violations of Maine's Minimum Wage Act, 26 M.R.S. § 661 et seq. (Count II).[2]

On February 3, 2011, the Plaintiffs moved to certify the collective action. *Mot. for Certification of Collective Action and to Facilitate Ct.-Approved Notice Under 29 U.S.C. § 216(b)* (Docket # 17) (*Pls.' Mot.*). VCG submitted its opposition to certification on February 24, 2011 and the Plaintiffs replied on March 10, 2011. *Def. VCG Corp.'s Opp'n to Pls.' Mot. for Certification of Collective Action and to Facilitate Ct.-Approved Notice Under 29 U.S.C. § 216(b)* (Docket # 22) (*Def.'s Opp'n*); *Pls.' Reply to Def. VCG Corp.'s Opp'n to Pls.' Mot. for Certification of Collective Action* (Docket # 27) (*Pls.' Reply*).

## B. The Parties' Positions

### 1. The Plaintiffs' Allegations

The Plaintiffs were formerly employed as "emcees" or "disc jockeys" at the PT's Showclub (the Club) in Portland, Maine—an adult entertainment club owned by VCG. They were paid between $3.50 and $3.75 an hour and also received money from Club dancers. The Plaintiffs allege that they were improperly treated as "tipped employees" by VCG, and paid less than the minimum wage. *Pls.' Mot.* at 1–2. The gravamen of the Plaintiffs' case is that money they received from VCG's

---

[1] Over VCG's opposition, the Plaintiffs later amended their complaint. *Mot. for Leave to File Am. Compl.* (Docket # 16); *Def. VCG Corp.'s Response to Pls.' Mot. for Leave to File Am. Compl.* (Docket # 21); *Order* (Docket # 25); *Am. Compl.* (Docket # 26).

[2] VCG initially challenged venue in Maine, and the Court denied its request to transfer to the District of Colorado. *Def. VCG Corp.'s Mot. to Transfer Venue to the Dist. of Colo.* (Docket # 8); *Order on Mot. for Change of Venue* (Docket # 23).

dancers was not a "tip," because the dancers were not the customers. They acknowledge occasionally receiving money directly from customers, but assert that such tips were exceedingly rare and fell beneath the $30-per-month minimum required of "tipped employees" under the FLSA. *See* 29 U.S.C. § 203(t). In the Plaintiff's view, they were entitled to the minimum hourly wage provided by the FLSA and Maine's Minimum Wage Law.

### 2. The Plaintiffs' Motion

The Plaintiffs seek certification of collective action of their FLSA claim.[3] Their motion initially addresses the legal underpinnings of their action: whether VCG Holding Corporation employed the Plaintiffs; whether the Plaintiffs held positions that would regularly and customarily engender tips; and whether the Plaintiffs received tips (albeit indirectly) in the form of a tip pool by other employees. To the first point, the Plaintiffs explain that the FLSA's definition of "employer" is "extremely generous," and that VCG "owns a partnership interest in some or some other form of property right in the club in Portland, Maine, where these Plaintiffs work, and in another eighteen states where they own or have an ownership in similar nightclubs."[4] *Pls.' Mot.* at 2. According to the Plaintiffs, in addition to VCG's ownership interest, its wholly-owned subsidiary, IEC, "provides oversight of operations, payroll processing, and other typical functions of an employer." *Id.* To the second point, the Plaintiffs succinctly assert that their job is

---

[3] The Plaintiffs do not seek class certification of their state law action. *See Prescott v. Prudential Ins. Co.*, 729 F. Supp. 2d 357, 363 & n.5 (D. Me. 2010) (noting that certification of a collective action under Maine's Minimum Wage law, 26 M.R.S. § 664, "would be governed by Federal Rule 23").

[4] The Court suspects that the Plaintiffs meant to describe a total of 18 other clubs in 8 states. *See Def.'s Opp'n* at 9.

to play music, they do not have regular contact with customers, and "disc jockeys are not persons who regularly and customarily receive tips from customers." *Id.* at 3. Lastly, the Plaintiffs preemptively dismiss VCG's assertion that the money Plaintiffs receive from the dancers amounts to tips from a tip pool. According to the Plaintiffs, VCG regards the dancers as independent contractors, not employees, and "[t]hus, under § 203(m)(2) of the Fair Labor Standards Act, the monies received by the plaintiff disc jockeys from the dancers cannot be used by the employer as a tip credit against the minimum wage because they do not come from a valid tip pool whose members are 'employees.'" *Id.* at 4

Turning to the heart of the motion—certification of collective action—the Plaintiffs explain that, at this stage, the determination to certify is lenient, and that they "need only demonstrate a 'reasonable basis' for the allegation that a class of similarly situated persons may exist." *Pls.' Mot.* at 6–7. They further argue that the "Court's facilitation of notice to potential opt-in plaintiffs in this case would serve 'the broad remedial purpose of the [FLSA]" and would promote judicial efficiency in staving off multiple, independent lawsuits. *Id.* at 7 (quoting *Dybach v. State of Fla. Dept. of Corr.*, 942 F.2d 1562, 1567 (11th Cir. 1991)) (alterations in *Pls.' Mot.*).

The Plaintiffs next address the statutory requirement that the putative defendants be "similarly situated." They characterize the class as "other employees who do the same work—that of a disc jockey—and are employed in nightclubs similar to the one in Portland, Maine." *Id.* at 8. There are supposedly 165 potential

plaintiffs in the class, and according to the Plaintiffs, "it is likely that the vast majority of these 165 people are no longer employed as disc jockeys with VCG," which makes them more likely to join the putative class than current employees. *Id.* at 9. The Plaintiffs acknowledge that they shoulder the burden of demonstrating the need for a collective action, but note that "[c]ourts have held that plaintiffs can meet this burden by simply alleging 'that the putative class members were together the victims of a single decision, policy, or plan' that violated the law." *Id.* (quoting *Mooney v. Aramco Servs. Co.*, 54 F.3d 1207, 1214 n.8 (5th Cir. 1995)).

The Plaintiffs also explain that time is of the essence since, "[a]s each day passes while notice has not been provided to potential opt-ins here, some former VCG Holding Company employees may lose their right to sue." *Id.* at 9–10. According to the Plaintiffs, expeditious notice to members of the putative class is necessary to protect the putative members' interest. *Id.* at 10. The Plaintiffs explain that they "have prepared a proposed notice and will submit it to the Court if directed to do so." *Id.*

Finally, the Plaintiffs request limited discovery of a mailing list of potential class members. *Id.*

### 3.    VCG's Opposition

VCG makes three opposing arguments. First, while acknowledging it is the parent company of KenKev II, Inc.—the direct owner of the Club—it says that the Plaintiffs have not overcome the "strong presumption that a parent corporation is not the employer of its subsidiary's employees." *Def.'s Opp'n* at 1. Applying the "economic reality" test as set forth by the First Circuit in *Donovan v. Agnew*, 712

F.2d 1509, 1510 (1st Cir. 1983), VCG concludes that it "does not meet any permutation of the . . . test with regard to Plaintiffs' employment." *Def.'s Opp'n* at 3.

Second, VCG argues that emcees at its clubs "are employees engaged in an occupation in which they receive more than $30 a month in tips from customers," and thus fall within the FLSA's definition of a "tipped employee." *Id.* at 5–6. It asserts that even assuming "Plaintiffs were to analogize the entertainers to club employees, this arrangement would fit squarely within the well-recognized notion of a tip pool." *Id.* at 7.

Finally, turning to the standard for collective certification under the FLSA, VCG rejects the Plaintiffs' evidence that there are others similarly situated. It says it "owns 19 independent nightclubs located in 9 states. Each club is a separate entity with its own management, who is responsible for all day-to-day operations of the club. . . . Plaintiffs are two former Emcees, who worked primarily at one location." *Id.* at 9. At best, it says, the Plaintiffs demonstrated that "***their*** work experience at KenKev was not typical." *Id.* at 10 (emphasis in *Def.'s Opp'n*). VCG similarly concludes that the Plaintiffs "have failed to demonstrate that any of the putative class members are interested in joining the suit." *Id.* (emphasis in *Def.'s Opp'n*).

### 4. The Plaintiffs' Reply

In their Reply, the Plaintiffs reject VCG's focus on the applicability of the FLSA, on the degree of control by VCG over the Plaintiffs' working conditions, on the employment status of the dancers, on the relationship between VCG and its

subsidiaries, and on the implications of their receipt of money from the dancers. *Pls.' Reply* at 1–2. According to the Plaintiffs, these "are not issues for the court to resolve at this point." *Id.* at 2. Still, they respond to VCG's arguments on these points.

Turning to joint employment, the Plaintiffs protest the prematurity of the inquiry, but conclude that in any event "there is enough evidence cited in the plaintiffs' principal motion to allow the case to proceed." *Id.* In support, the Plaintiffs point to statements in VCG's annual Form 10-K filing with the Securities and Exchange Commission arguably showing employer-like functions by VCG. *Id.* at 2–3. They also dismiss as inapplicable the "common law parent-subsidiary rule" in favor of the "economic reality" test. *Id.* at 3.

Addressing the legal status of the dancers, the Plaintiffs explain that the determination alters the way money received from the dancers is viewed under the FLSA. *Id.* at 5. That is, if the dancers are viewed as either employees or customers, the money is viewed as a "tip" and the Plaintiffs would qualify as tipped employees. *Id.* Conversely, if the dancers are viewed as independent contractors, "the amounts [the emcees] receive from customers may not be 'tips' within the meaning of the statute." *Id.* at 6. The Plaintiffs say that the dancers' "confused" status is a problem created by VCG, but conclude that the dancers' status is beside the point since their motion for certification was filed before discovery and this "is not the appropriate time to determine all of the factual and legal questions involved in the case." *Id.* at 5.

Finally, the Plaintiffs argue that their failure to name individuals interested in joining the action is not fatal to class certification. In their view, "[a]ffidavits of both plaintiffs demonstrate that other disc jockeys are dissatisfied with receiving only half of the minimum wage." *Id.* at 6–7.

## II.    DISCUSSION

### A.    Class Certification Under the FLSA

The FLSA provides its own right and mechanism for collective certification distinct from Rule 23. *Compare* 29 U.S.C. § 216 *with* FED. R. CIV. P. 23. Under the FLSA:

> [a]n action to recover the liability . . . may be maintained against any employer . . . in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). The central difference between collective certification under the FLSA and under Rule 23 is the FLSA's requirement that those interested in joining the putative class opt in, while Rule 23 certification requires the uninterested to opt out. *Cameron-Grant v. Maxim Healthcare Servs., Inc.*, 347 F.3d 1240, 1249 (11th Cir. 2003) (explaining that "§ 216(b) is a fundamentally different creature than the Rule 23 class action"); *Grayson v. K Mart Corp.*, 79 F.3d 1086, 1096 n.12 (11th Cir. 1996) ("[I]t is clear that the requirements for pursuing a §216(b) class action are independent of, and unrelated to, the requirements for class action under Rule 23 of the Federal Rules of Civil Procedure"); *LaChapelle v. Owens-Illinois, Inc.*, 513 F.2d 286, 288 (5th Cir. 1975) (noting that the "fundamental, irreconcilable difference

between the class action described by Rule 23 and that provided for by FLSA §
16(b)" is that under the FLSA "no person can become a party plaintiff and no person
will be bound by or may benefit from judgment unless he has affirmatively 'opted
into' the class"). The statute outlines the general framework: those wishing to enter
the suit must give and file written consent; the court then certifies that those
seeking to join the class are "similarly situated." 29 U.S.C. § 216(b). Moreover,
"[a]lthough the FLSA does not provide for court-ordered notice of a pending
collective action, the Supreme Court has held that 'district courts have discretion . .
. to implement 29 U.S.C. 216(b) . . . by facilitating notice to potential plaintiffs.'"
*Prescott*, 729 F. Supp. 2d at 362–63 (quoting *Hoffmann-La Roche Inc. v. Sperling*,
493 U.S. 165, 165 (1989)).

As Judge Hornby noted recently, "[t]he Supreme Court and the First Circuit
has not addressed the issue [of what qualifies as "similarly situated"], and the other
Circuits have not drawn bright lines for determining whether employees are
'similarly situated.'" *Id.*; *see also Melendez Cintron v. Hershey Puerto Rico, Inc.*, 363
F. Supp. 2d 10, 15 (D.P.R. 2005). The general practice of district courts within the
First Circuit—including this Court—has been to adopt a "two-tiered" approach to
certification of collective actions under the FLSA. *Prescott*, 729 F. Supp. 2d at 363–
64 ("[T]he certification of a collective action 'typically proceed[s] in two stages'");
*O'Donnell v. Robert Half Int'l, Inc.*, 429 F. Supp. 2d 246, 249 (D. Mass. 2006)
(applying "a 'two-tiered' approach to determining whether named plaintiffs and
putative class members are similarly situated"); *Wise v. Patriot Resorts Corp.*, C.A.

No. 04-30091-MAP, 2006 WL 6110885, at *1 (D. Mass. Feb. 15, 2006) (using the "two-step process"); *Melendez Cintron*, 363 F. Supp. 2d at 15 n.5 ("[T]his Court is convinced that the reasonable approach to resolving 'opt-in' controversies under Section 16(b) of the FLSA is the two-tiered approach"); *Kane v. Gage Merch. Servs., Inc.*, 138 F. Supp. 2d 212, 214 (D. Mass. 2001) (same); *Reeves v. Alliant Techsystems, Inc.*, 77 F. Supp. 2d 242, 246 (D.R.I. 1999) (same).[5]    Under the two-tiered framework, "[t]he first stage determines whether notice should be given to potential collective action members and usually occurs earlier in a case, before substantial discovery, 'based only on the pleadings and any affidavits which have been submitted.'" *Prescott*, 729 F. Supp. 2d at 363–64 (quoting *Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208 (11th Cir. 2001)).  The second stage occurs at the completion of discovery when the employer may move to decertify the class action.  *Id.*  At the second stage, the Court is tasked with making "a factual determination as to whether there are similarly-situated employees who have opted in."  *Id.* at 634 (quoting *Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916 n.2 (5th Cir. 2008)).

This motion falls within the first stage.  Thus, the Plaintiffs have "the burden of showing a reasonable basis for [their] claim that there are other similarly situated employees."  *Id.* (quoting *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1260 (11th Cir. 2008)) (internal quotation marks omitted).  "Plaintiffs accomplish this via a minimal factual showing that (1) there is a reasonable basis

[5] The two-tiered approach has likewise been embraced nationally.  *See Leuthold v. Destination Am., Inc.*, 224 F.R.D. 462, 466 (N.D. Cal. 2004) (noting that a majority of courts have adopted the two-tiered inquiry); *Threatt v. Residential CRF, Inc.*, No. 1:05CV117 WCL, 2005 WL 4631399, at *2 (N.D. Ind. Aug. 31, 2005) (same).

for crediting the assertion that aggrieved individuals exist; (2) those aggrieved individuals are similarly situated to the plaintiff in relevant respects given the claims and defenses asserted; and (3) those individuals want to opt in to the lawsuit." *Albanil v. Coast 2 Coast, Inc.*, Civil Action No. H-08-486, 2008 WL 4937565, at *6 (S.D. Tex. Nov. 17, 2008) (internal quotation marks omitted). The burden is light. Other courts have variously called it "not particularly stringent," "fairly lenient," "flexible," "not heavy," and "less stringent than that for joinder under Rule 20(a) or for separate trials under 42(b)." *Prescott*, 729 F. Supp. 2d at 363–64. This Court employs the same "fairly lenient" standard as adopted by Judge Hornby. *Id.* at 367.

### 1. "Similarly Situated" Employees

While the FLSA requires that members of a collective action be "similarly situated," it does not define the term. Courts have been similarly circumspect. *See, e.g., Morgan*, 551 F.3d at 1259–60 (defining "what the term does not mean—not what it does"); *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1105 (10th Cir. 2001) (endorsing the Eleventh Circuit's "*ad hoc* approach"); *Mooney*, 54 F.3d at 1213 (adopting an analysis, which, "lends itself to *ad hoc* analysis on a case-by-case basis"), *overruled on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003). Nonetheless, although the precise contours of the "similarly situated" remain defined, the analysis generally focuses on whether employees "have similar (not identical) job duties and pay provisions, . . . and are 'victims of a common policy or plan that violated the law.'" *Prescott*, 729 F. Supp. 2d at 363–64 (internal citations omitted). "The plaintiff must make 'a modest factual showing' that [he]

and other employees, with similarly but not necessarily identical jobs, suffered from a common unlawful plan." *Id.* Moreover, "[f]or a class to extend beyond the named plaintiffs' own work location, [the Plaintiff] must demonstrate that 'employees outside of the work location for which the employee has provided evidence' were similarly affected by the employer's policies." *Travers v. JetBlue Airways Corp.*, Civil Action No. 08-10730-GAO, 2010 WL 3835029, at *2 (D. Mass. Sept. 30, 2010).

Ernest Johnson declares that he worked at the PT's Showclub in Portland, Maine from September 2006 until July 2010 where he was paid $3.75 per hour in addition to "some money from the dancers who earned money by dancing." *Pls.' Mot.* Attach 1 (*Johnson Decl.*) ¶¶ 3–4. He explains that, as a disc jockey, his job required him to be close to the music booth, which was closed to customers. *Id.* ¶ 5. Consequently, he "was rarely tipped by customers," and on those occasions when he was tipped, would receive only "one or two dollars" per month. *Id.* Brian Prindle, also a disc jockey at PT's Showclub making $3.50 per hour, declared that he had previously worked for a VCG-owned club in Memphis, Tennessee, and that when VCG acquired the club, his "pay was reduced from $8.00 per hour to one half of the minimum wage." *Pls.' Mot.* Attach 3 (*Prindle Decl.*) ¶¶ 3–5. Mr. Prindle echoes Mr. Johnson's statements that he seldom interacted with customers and, as a result, infrequently received tips of $1.00 or $2.00 and sometimes $5.00 [but q]uite often three of four weeks would pass when we would receive no tips at all from customers." *Id.* ¶ 6. Messrs. Johnson and Prindle both state that they are "aware of other disc jockeys that work for VCG who are dissatisfied with receiving only half

the minimum wage." *Johnson Decl.* ¶ 6; *accord Prindle Decl.* ¶ 7. The Plaintiff also offers the declaration of Max Van Dorn, who states that he frequented the Men's Club of Raleigh on October 21, 2010, and attempted but was unable to tip the disc jockey because the disc jockey "was in a booth up above the entertainment floor [and a]t the foot of the stairs there was a sign that said 'No Customers.'" *Pls.' Mot.* Attach 2 (*Van Dorn Decl.*) ¶¶ 2, 4. Mr. Van Dorn declared that he did not see a tip jar for the disc jockeys, did not see any disc jockey receiving tips from any customers, and did not view any way to pass tips to the disc jockeys. *Id.* at ¶¶ 5–6.

VCG responds with its own series of affidavits from both disc jockeys and entertainers at VCG-owned clubs in Illinois, Indiana, Colorado, North Carolina, Kentucky, Texas, Florida and Maine. *Def.'s Opp'n* Attach 1 at 1–3. The disc jockeys declare that they spent between 20 and 90 percent of each shift interacting with customers, and received tips from entertainers, other employees and customers. *Def.'s Opp'n* Attach 1 (*Disc Jockey Decls.*) at 6–46. The entertainers explain that the disc jockeys "spend a significant amount of time on the floor interacting with entertainers and customers" and that "it is customary for entertainers to tip emcees . . . at the end of our shift." *Def.'s Opp'n* Attach 2 (*Entertainer Decls.*) at 2–40.

The Court concludes that the Plaintiffs have carried their burden, light as it is at this stage. Both Johnson and Prindle declare that they are aware of other disc jockeys who also made less than minimum wage and both declare that the layout of the Club secluded them from customers. It is a fair inference that other disc jockeys were also unable to access customers from whom they might have otherwise

received tips. Further, Mr. Prindle declares that when VCG acquired the Memphis club at which he was then working, his "pay was reduced from $8.00 per hour to one half of the minimum wage," *Prindle. Decl.* ¶ 5, from which it is reasonable to conclude that it was a VCG policy to pay its disc jockeys less than minimum wage. The evidence is a sufficient factual showing at this stage that the disc jockeys at VCG's clubs are similarly situated.

## 2. VCG Locations Outside of Maine

The Plaintiffs seek certification of a class including all disc jockeys at all of VCG's locations, rather than only those working at VCG's Portland club. "For a class to extend beyond the named plaintiffs' own work location, they must demonstrate that 'employees outside of the work location for which the employee has provided evidence' were similarly affected by the employer's policies." *Travers*, 2010 WL 3835029, at *2 (quoting *Horne v. United Servs. Auto. Ass'n*, 279 F. Supp. 2d 1231, 1235 (D. Ala. 2003)). While "[t]he named plaintiffs need not 'demonstrate the existence of similarly situated persons at every location in the proposed class,' [they] 'must demonstrate that there existed at least one similarly situated person at a facility other than [their] own.'" *Id.* (quoting *Adams v. Inter-Con Sec. Sys., Inc.*, 242 F.R.D. 530, 537 (N.D. Cal. 2007)). "[D]ifferences in work locations, work assignments, [and] compensation structures" are all relevant factors in assessing whether members of the putative class are sufficiently similarly situated to justify collective action under the FLSA. *Albritton v. Cagle's, Inc.*, 508 F.3d 1012, 1015 (11th Cir. 2007) (affirming the district court's decertification "because the differences in work locations, work assignments, compensation structures, and

protective clothing meant that the plaintiffs were not similarly situated enough to maintain a collective action under the FLSA").

VCG explains that it has nineteen locations and that "[e]ach club is a separate entity with its own management, who is responsible for all day-to-day operations of the club, including hiring and firing, establishing policies and procedures, and managing all club employees." *Def.'s Opp'n* at 9. VCG highlights that "Plaintiffs are two former Emcees, who worked primarily at one location." *Def.'s Opp'n* at 9. But this does not tell the whole story. Although Mr. Johnson worked only at the PT's Showclub in Portland, Mr. Prindle previously worked for VCG at a club in Memphis, Tennessee. *Johnson Decl.* ¶ 3; *Prindle Decl.* ¶ 4. Mr. Prindle states in his declaration that "when VCG took over the club from the previous owner, Tiffany Cabaret, my pay was reduced from $8.00 per hour to one half of the minimum wage." *Prindle Decl.* ¶ 5. In light of the fairly lenient standard at the notice stage, the Court concludes that Mr. Prindle's experience at VCG's Memphis club is sufficient to justify conditional certification at VCG locations outside of Portland, Maine. *Compare Prescott*, 729 F. Supp. 2d at 369 (concluding that employees in both Maine and New Jersey could be part of the collective action where "one opt-in reported to a supervisor in New Jersey, and one opt-in works in New Jersey," there was evidence that employees were subject to the same general practices, and their units had been set up by a manager who worked in Maine and New Jersey) *with Trezvant v. Fid. Emp'r Servs. Corp.*, 434 F. Supp. 2d 40, 51 (D. Mass. 2006) (concluding that "[t]he Employees failed to show that

Fidelity's policies . . . are company-wide . . . [where] the affidavits were all from employees that worked in the company's New Hampshire office [and n]one of the Employees submitting affidavits purported to know the policies of other branches of the company").

The Court notes that affidavits by other VCG disc jockeys suggest that the experiences and duties of VCG's disc jockeys were hardly uniform, with some spending as much as ninety percent of their time interacting closely with customers, and others only twenty percent. *Disc Jockey Decls.* at 6–46. Discovery may reveal significant variation in the activities, duties, and compensation of emcees at VCG's clubs. Nonetheless, these differences are best considered at the second stage after discovery has provided "a more extensive and detailed factual record." *Morgan*, 551 F.3d at 1261 (noting that factors to be considered at the second stage include "(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to the defendant[s] [that] appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations" (alterations in *Morgan*)).

### 3. Interest in Joining

Having cleared the first two hurdles to conditional certification, the Plaintiffs stumble at the third. A number of courts regard the identification of others interested in joining the putative class as a requirement before conditional certification. One court explained:

> a plaintiff must do more than show the mere existence of other similarly situated persons, because there is no guarantee that those persons will actually seek to join the lawsuit. And, if those other, similarly situated persons were to decline to opt in to the case, no purpose would have been served by "certifying" a collective-action

"class"—the case ultimately would involve no one other than the plaintiff. Furthermore, if an FLSA plaintiff were required to show only that other potential plaintiffs exist (rather than showing that those potential plaintiffs would actually seek to join the lawsuit), it would "render preliminary class certification automatic, as long as the Complaint contains the magic words: 'Other employees similarly situated.'"

*Parker v. Rowland Express, Inc.*, 492 F. Supp. 2d 1159, 1165 (D. Minn. 2007) (quoting *Smith v. Sovereign Bancorp, Inc.*, No. Civ.A. 03-2420, 2003 WL 22701017, at *2 (E.D. Pa. Nov. 13, 2003)). Within the First Circuit, in *O'Donnell v. Robert Half Intern., Inc.*, 429 F. Supp. 2d 246, 250–51 (D. Mass. 2006), a district court took the view that a "plaintiffs' personal beliefs, by themselves, are insufficient as a matter of law to satisfy their burden of proof." There, the Plaintiffs' statements that they were "familiar with other current and former employees of the Company" and that they "believe[d]" that many would be interested in participating in the litigation was ruled insufficient where the plaintiffs "fail[ed] to identify by name a single member of the putative class ready to participate." *Id.* The Massachusetts district judge is not alone in imposing an identification requirement; the Eleventh Circuit and numerous other district courts have held the same. *See, e.g., Dybach*, 942 F.2d at 1567–68 (holding that before exercising its power to give notice, "the district court should satisfy itself that there are other employees . . . who desire to 'opt-in'"); *Gonzalez v. Go Relax Travel, LLC*, No. 6:09-cv-573-Orl-28KRS, 2009 WL 3817119, at *3 (M.D. Fla. Nov. 13, 2009) (quoting *Guerra v. Big Johnson Concrete Pumping, Inc.*, No. 05-14237-CIV, 2006 WL 2290512, at *4 (S.D. Fla. May 17, 2006), for the proposition that the "mere anticipation that others may want to join the lawsuit or the mere presence of a uniformly adverse compensation policy is insufficient by

itself"); *Hoffer v. Ocwen Loan Servicing, Inc.*, No. 08-81399-CIV, 2009 WL 1404696, at *2 (S.D. Fla. May 19, 2009) (denying conditional certification where the Plaintiffs filed statements that were "speculative," had "the tincture of lawyer-speak," named no individuals, and was "non-committal"); *Albanil*, 2008 WL 4937565, at *6 (stating that at the notice stage, Plaintiffs must make "a minimal factual showing that . . . 'aggrieved individuals exist . . . [and] those individuals want to opt in to the lawsuit'"); *Detho v. Bilal*, Civil Action No. H-07-2160, 2008 WL 2962821, at *1 (S.D. Tex. Jul. 29, 2008) (collecting cases); *Tyler v. Payless Shoe Source, Inc.*, 2:05-CV-33F(WO), 2005 WL 3133763, at *3 (M.D. Ala. Nov. 23, 2005) (considering whether there was "evidence that at least some potential plaintiffs are interested in joining the suit"); *Mackenzie v. Kindred Hosps. E., LLC*, 276 F. Supp. 2d 1211, 1220–21 (M.D. Fla. 2003) ("[A] showing that others desire to opt-in must be made before notice is authorized").

As regards the identification of other interested disc jockeys, the Plaintiffs' declarations are weak. Mr. Johnson states:

> I am aware of other disc jockeys who worked in the same nightclub in Portland, Maine, where I worked who were very dissatisfied when our pay was reduced to $3.50 per hour. I think they would be very interested in learning that this case is about whether that is legal or not.

*Johnson Decl.* ¶ 7. Mr. Prindle declares:

> "I am aware of other disc jockeys that work for VCG who are dissatisfied with receiving only half the minimum wage."

Prindle Decl. ¶ 6. VCG argues that the Plaintiffs "have failed to demonstrate that any of the putative class members are interested in joining the suit." *Def.'s Opp'n* at

10.  The Court agrees that the Plaintiffs fail to specifically identify others interested in joining the putative class, and notes the similarity between Messrs. Johnson and Prindle's declarations and the affidavits in *O'Donnell*.[6]

Although the existence of multiple named plaintiffs may in some instances be sufficient to demonstrate the existence of interested others, *see Albanil*, 2008 WL 4937565, at *6 (explaining that "[t]he existence of fifteen named plaintiffs and at least three unnamed plaintiffs clearly establishes that 'aggrieved individuals' exist"), the existence of only two named plaintiffs here does not convince the Court that there are others who also seek to join, *see Parker*, 492 F. Supp. 2d at 1165 n.4 ("If, for example, *eight* employees together were to commence an FLSA action, it might be unnecessary to show that others desire to opt in to the litigation, since the sheer number of plaintiffs, standing alone, could render the case "appropriate" for collective-action status. . . . Although the Court cannot draw a precise numerical line . . . it believes that two plaintiffs . . . is insufficient").

In requiring a showing of other individuals interested in joining suit, the Court is aware that "[t]here is a potential for a 'chicken and egg' problem" in that "[r]equiring an FLSA plaintiff who does not know the identities of the members of the proposed class to provide information about class members' desire to opt in

---

[6] The Court is struck by the speculative nature of the Plaintiffs' declarations.  Mr. Johnson states only a belief that others would be interested in learning of the existence of the case, and Mr. Prindle's does not go even that far.  Neither names any individual who intends to join the action, nor do they assert that there are unnamed individuals who are interested in joining, or even *might* wish to join.  Although both say they know of other disc jockeys unhappy with their compensation, this is hardly an extraordinary complaint by an employee, and it falls far short of the specificity required to conclude there is a likelihood any of the unnamed disc jockeys wish to join the litigation.  *See Mackenzie*, 276 F. Supp. 2d at 1220 ("[U]nsupported expectations that additional plaintiffs will subsequently come forward are insufficient to justify notice").

could require the plaintiff to produce the very information that she sought to obtain through conditional certification and notice." *Detho*, 2008 WL 2962821, at *3. Indeed, an overly rigid and inflexible analysis risks the creation of a Catch-22 wherein Plaintiffs need to identify and notify members of the putative class before seeking a court order to allow for identification and notification. *See Wise*, 2006 WL 6110885, at *1 ("[I]t is unrealistic to expect a party to consider whether to 'opt-in' to a collective action before that party is aware of the pendency of the action"). However, the notice stage's light burden combined with any preliminary discovery a Court might allow, should be sufficient to alleviate such concerns. *See Detho*, 2008 WL 2962821, at *1 (noting that a previous order directing "the defendants to provide [the Plaintiff] with information as to the identities of its former and current employees over the last three years" was sufficient to overcome the "chicken and egg" problem).

The Court perceives no such a problem here. Mr. Johnson worked at the PT's Showclub for nearly four years (September 2006 until July 2010). *Johnson Decl.* ¶¶ 3–4. Mr. Prindle worked at the PT's Showclub for eight years (2001 until July 2009), and worked for a VCG club in Memphis before that. *Prindle Decl.* ¶¶ 3–5. Between the two of them, they have more than twelve years of club experience and admit to knowing a number of VCG disc jockeys well enough to be aware of their dissatisfaction with the pay system. The Plaintiffs have not established that they require a court order to identify potential members of the putative class who would

otherwise remain unknown to the Plaintiffs; Messrs. Johnson and Prindle likely possess this knowledge already.

In short, the Plaintiffs have neither identified not suggested the existence of other disc jockeys who intend to join the litigation pending collective certification by the Court. It may be that the Plaintiffs know others who are interested in joining the case but merely neglected to say so in their declarations. The Court will reconsider the Plaintiffs' motion if they can present evidence that other current or former VCG disc jockeys would seek to join the case if the Court were to certify a collective action. Alternatively, the Court will consider the Plaintiffs' limited discovery issue if they can establish more specifically why they are entitled to such an order.

## B. Joint Employers and Tipped Employees

Through its objection to class certification, VCG spends significant time addressing the underlying issues of liability. First, it questions the Plaintiffs' justification for involving VCG in the suit, asserting that "Plaintiffs rely *exclusively* upon common ownership to establish that VCG is joint employers with KenKev and the other VCG-owned clubs," and concluding that the Plaintiffs lack the evidence "to overcome the strong presumption that a parent corporation is not the employer of its subsidiary's employees." *Def.'s Opp'n* at 1–2. Second, VCG argues that the named and putative Plaintiffs are "tipped employees" as defined by 29 U.S.C. § 203(t), and therefore fall outside the minimum wage requirements of the FLSA. *Def.'s Opp'n* at 5–6.

The Court does not reach whether the Plaintiffs are tipped employees under the FLSA or whether VCG is liable as a joint employer.  These issues are properly reserved for dispositive motions or for the second stage of the class certification process should the Defendant move for decertification.  The focus here is the preliminary class-certification inquiry, and determination of the surrounding questions of liability, including the putative plaintiffs' status as "employees," are best left for later.  The Western District of Tennessee observed recently that at the notice stage of certification "the Court is only determining the issue of conditional class certification and the proper scope of the proposed class and notice and any questions of a particular defendant's liability can be taken up at a later time." *Lindberg v. UHS of Lakeside, LLC*, 761 F. Supp. 2d 752, 762 (W.D. Tenn. 2011) (internal quotation marks and citation omitted); *see also Manning v. Goldbert Falcon, LLC*, Civil Action No. 08-3427 (JEI), 2010 WL 3906735, at *3 (D.N.J. Sept. 29, 2010) (noting that "[i]n instances where a motion for conditional certification involves a potential class of employees that worked for separate, but related, employers, courts have reserved consideration of whether the separate employers are joint employers for a final, stage two determination"); *In Re: Enterprise Rent-A-Car Wage & Hour Emp't Practices Litig.*, MDL No. 2056., 2010 WL 3447783, at *25 n.15 (W.D. Pa. Aug. 13, 2010) ("Even though a parent is not a joint employer under the FLSA, collective action certification may still be appropriate"); *Enkhbayar Choimbol v. Fairfield Resorts, Inc.*, 475 F. Supp. 2d 557, 562 (E.D. Va. 2006) (rejecting the Defendant's assertion that "the Court must determine whether [the

Defendant] is a joint employer . . . [since t]he district court has the discretion even when the court 'has minimal evidence' to grant Plaintiffs' a 'conditional certification' of a representative class").  Furthermore, the Court's determination of these issues would be aided by additional discovery and briefing relating to the nature of the work performed by the disc jockeys.  *See, e.g., Kilgore v. Outback Steakhouse of Florida, Inc.*, 160 F.3d 294, 301–02 (6th Cir. 1998) (assessing "tipped employee" status in light of how the employees spend their time, the extent of their contact with customers and whether they were in a position to receive tips).  In the Court's view, if the Plaintiffs are able to establish the "interested in joining" factor, the better course would be to conditionally certify the class subject to the Defendant's future motions.  *See Aguilar v. Complete Landsculpture, Inc.*, No. Civ.A.3:04 CV 0776 D, 2004 WL 2293842, at *3 (N.D. Tex. Oct. 7, 2004) (explaining that a court can conditionally certify a class and "determine at a later time whether defendants are joint employers").

## III.  CONCLUSION

The Court DISMISSES without prejudice Ernest E. Johnson III and Brian S. Prindle's Motion for Certification of Collective Action and to Facilitate Court-Approved Notice under 29 U.S.C. § 216(b) (Docket # 17).

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE

Dated this 25th day of July, 2011