UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

ERNEST E. JOHNSON, III and )
BRIAN S. PRINDLE, )
                                   )
                Plaintiffs, )
                                   )
         v. )             1:10-cv-00442-JAW
                                   )
VCG HOLDING CORPORATION, )
                                   )
             Defendant. )

**ORDER ON MOTIONS FOR SUMMARY JUDGMENT**

     The corporate and employment structure of adult entertainment nightclubs is occasionally exotic. The Plaintiffs, emcees who worked at a Defendant-owned nightclub, contend that their tips from dancers, who are independent contractors, should not count for purposes of the Federal Labor Standards Act. Despite determining that the record raises genuine issues of material fact as to whether the corporate parent is a proper defendant, the Court concludes that the money an entertainer gives an emcee constitutes a tip within the meaning of the FLSA and grants summary judgment in favor of the nightclub owner. Finally, with the disposition of the federal statutory claim, the Court declines to maintain supplemental jurisdiction over the state law claims and dismisses them without prejudice.

I.      STATEMENT OF FACTS

        A.      Procedural Background

        On October 27, 2010, Ernest E. Johnson, III and Brian S. Prindle initiated

"an individual and collective action" on behalf of "all persons who are or have been

employed by defendant VCG Holding Corporation . . . as dis[c] jockeys at any time

within [the previous] three years . . . through the date of the final disposition of this

action."   *Compl.* at 1-2 (Docket # 1).   Individually and on behalf of proposed

members of the collective action, the Plaintiffs allege that VCG Holding Corporation

(VCG) violated the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq. (Count

I) and individually, they allege violations of Maine's Minimum Wage Act, 26 M.R.S.

§ 661 et seq. (Count II).

        On August 12, 2011, VCG moved for summary judgment and filed a

statement of material facts.   *Def. VCG Holding Corp.'s Mot. for Summ. J.* (Docket #

46) (*Def.'s Mot.*); *Def. VCG Holding Corp.'s Statement of Material Facts in Support

of its Mot. for Summ. J.* (Docket # 47) (DSMF).   On September 15, 2011, the

Plaintiffs filed their opposition to VCG's motion for summary judgment, responded

to VCG's statement of material facts, and proposed a set of additional facts.   *Pls.'*

*Opp'n to Def. VCG Holding Corp.'s Mot. for Summ. J.* (Docket # 50) (*Pls.' Opp'n*);

*Pls.' Statement of Material Facts in Opp'n to Def. VCG Holding Corp's Statement of

Material Facts in Support of its Mot. for Summ. J.* (Docket # 51) (PRDSMF); *Pls.'

Additional Statement of Material Fact in Opp'n to the Def.'s Mot. for Summ. J.*

(Docket # 51) (PSAMF).   On September 30, 2011, VCG filed its reply to the

Plaintiffs' response to its motion for summary judgment and its response to the Plaintiffs' statement of additional material facts. *Def. VCG Corp.'s Reply in Support of its Mot. for Summ. J.* (Docket # 56) (*Def.'s Reply*); *Def. VCG Corp.'s Reply to Pls.' Additional Statement of Material Facts in Opp'n to Def.'s Mot. for Summ. J.* (Docket # 57) (DRPSAMF).

On August 12, 2011, the Plaintiffs also moved for partial summary judgment and filed a statement of material facts. *Pls.' Mot. for Partial Summ. J.* (Docket # 44) (*Pls.' Mot.*); *Pls.' Statement of Material Facts* (Docket # 45) (PSMF).   On September 16, 2011, VCG filed its opposition to the Plaintiffs' motion for summary judgment, a response to the Plaintiffs' statement of material facts, and a set of additional facts. *Def. VCG Holding Corp.'s Opp'n to Pls.' Mot. for Partial Summ. J.* (Docket # 52) (*Def.'s Opp'n*); *Def. VCG Holding Corp.'s Opp'n to Pls.' Statement of Material Facts and Statement of Additional Facts* (Docket # 53) (DRPSMF; DSAMF).   On September 22, 2011, the Plaintiffs moved for leave to consolidate their filings so that their response to VCG's motion for summary judgment would be considered their reply to VCG's response to their motion for summary judgment and their statement of material facts in opposition to VCG's statement of material facts would be considered their reply to VCG's response to their statement of material facts. *Expedited Mot. for Leave to File Abbreviated Reply to Def.'s Resp. to Pls.' Mot. for Partial Summ. J.* (Docket # 54) (*Expedited Mot.*).   The Court granted the motion on September 23, 2011.  *Order* (Docket # 55).

## B.   VCG's Motion:  The Facts

### 1.   The Plaintiffs

Ernest E. Johnson, III and Brian S. Prindle were formerly employed as disc jockeys (Emcees) by KenKev II, Inc., d/b/a PT's Showclub Portland (P.T.'s or the Portland Club), an adult entertainment nightclub owned by VCG Holding Corp. in Portland, Maine.[1]  DSMF ¶ 1; PRDSMF ¶ 1.

### 2.   VCG's Corporate Structure

VCG is a Colorado corporation that owns, via stock, membership, or partnership interest, 18 businesses that operate nightclubs providing adult entertainment.  DSMF ¶ 3; PRDSMF ¶ 3.  VCG was formerly a publicly-traded corporation; however, as of April 18, 2011, it is no longer publicly-traded and is owned by a private entity, Family Dog, LLC, a Colorado limited liability company. *Id.*  Each entity is separately incorporated and maintains proper corporate formalities.[2]  *Id.*  VCG acquired the stock of KenKev from its prior owner on September 14, 2007.  DSMF ¶ 5; PRDSMF ¶ 5.

---

[1] The Court has not included the next sentence of paragraph 1 and all of paragraph 2 of VCG's statement of material facts because they are not facts.  DSMF ¶¶ 1-2.

[2] In its paragraph four, VCG says that it has no employees, no payroll, and maintains no employment or human resource documents.  DSMF ¶ 4.  It goes on to say that it does not manage clubs, has no offices at clubs, does not hire or fire any club employees, does not pay or contribute to the clubs' payrolls, does not enter into contracts on behalf of clubs, and does not control their day-to-day operations.  *Id.*  The Plaintiffs denied this paragraph, saying that they assume by "employees," VCG is referring to someone other than them and that Ms. Danner is an employee of VCG.  PRDSMF ¶ 4.  As the Court is required to view the facts in the light most favorable to the non-movants, the Court has not included VCG's paragraph.  Furthermore, the Court notes that in her emails, Ms. Danner identified herself as the Human Resources and Payroll for "VCG Holding Corp."  PSAMF Attach. 1 *Collection of Emails.*

4

### 3.    KenKev

KenKev is a Maine corporation that owns all licenses and permits to operate P.T.'s Showclub—Portland.  *Id.*  Mr. Ocello is a director of KenKev.  *Id.*  At the time of acquisition, the Portland Club was called Platinum Plus, and KenKev continued to operate the club under that name until June 2009, when the name changed to P.T.'s Showclub.  DSMF ¶ 6; PRDSMF ¶ 6.  KenKev employs its own staff (i.e. managers, bartenders, bar backs, waitresses, housemothers, emcees, etc.) and enters into lease agreements with the entertainers to perform at the Portland Club.  DSMF ¶ 6; PRDSMF ¶ 6.  Each club maintains its own employment files, books, records and payroll; however, the corporate office in Denver, Colorado does as well.[3]  DSMF ¶ 7; PRDSMF ¶ 7.  The Plaintiffs admit that KenKev was listed as their employer on their W-2 tax forms.  DSMF ¶ 8; PRDSMF ¶ 8.  KenKev is currently managed by Gary Schellen and he holds the title Area Director.  DSMF ¶ 9; PRDSMF ¶ 9.  Before Mr. Schellen, Paul Clement was the Area Director for KenKev.  *Id.*  Mr. Clement testified that he was employed by KenKev.  *Id.*

### 4.    VCG, Employees, and the Clubs

Several Maine licenses issued to the Portland Club list Colorado as the address of the club.[4]  PSAMF ¶ 43; DRPSAMF ¶ 1.  The Manager of the Portland

---

[3] VCG's paragraph 7 consists of only the first part of this statement.  DSMF ¶ 7.  However, the Plaintiffs interposed a qualified response, adding that the corporate offices in Denver also maintain such files.  Consistent with its obligation to view the facts in the light most favorable to the Plaintiffs, the Court has included the Plaintiffs' additional statement.  PRDSMF ¶ 7.

[4] VCG interposed a qualified response, itemizing the addresses in several licenses.  DRPSAMF ¶ 1.  Having reviewed VCG's response, the Court concludes that it does not contradict the Plaintiffs' paragraph and, in any event, the Court is required to view the facts for VCG's motion in the light most favorable to the Plaintiffs.

Club has little idea as to when and how the licenses were obtained, suggesting that they were obtained by the Colorado corporate office.[5]  PSAMF ¶ 44; DRPSAMF ¶ 2. VCG's Department of Human Resources in Colorado maintains the payroll records and other human resource concerns for the Portland Club.[6]  PSAMF ¶ 45; DRPSAMF ¶ 3.  VCG stated in its 2009 Annual Report that it has "approximately 925 employees, of which 135 were full-time management employees, including corporate and administrative functions, and approximately 790 who were engaged in entertainment, food and beverage service, including bar tenders and waitresses."[7] PSAMF ¶ 46; DRPSAMF ¶ 4.  VCG was the subject of two audits by the United States Department of Labor (DOL) relating to whether its employees were paid according to the Fair Labor Standards Act.[8]  PSAMF ¶ 47; DRPSAMF ¶ 5.  VCG stated to the DOL that "[w]e continually monitor the actions of entertainers,

---

Instead of responding by corresponding paragraph number, i.e. 43, VCG's responses are number from number one onward.  The Court has used VCG's numbering.

[5] VCG interposed a qualified response, agreeing that Mr. Clement did not personally obtain the licenses but said that IEC provides management services for the Portland Club.  DRPSAMF ¶ 2. VCG makes some affirmative statements about IEC.  *Id.*  The Court concludes that VCG's statements do not contradict the Plaintiffs' paragraph 44 and, in any event, the Court is required to view the facts in the light most favorable to the Plaintiffs.

[6] VCG denies this paragraph, asserting that VCG has no employees, no payroll, and maintains no employment or human resource documents.  DRPSAMF ¶ 3.  However, in the emails attached to the Plaintiffs' response, Ms. Danner identifies herself as the Director of Human Resources and Payroll for "VCG Holding Corporation."  PSAMF Attach. 1 *Collection of Emails*.  This statement is sufficient for the Court to accept the paragraph, viewing the evidence in the light most favorable to the Plaintiffs.

[7] VCG interposed a qualified response, admitting that its 2009 Annual Report contained the statement but asserting that its numbers included its subsidiaries.  DRPSAMF ¶ 4.  The Court treats the statement as admitted.

[8] VCG interposed a qualified response, referring to its response to paragraph 4, presumably that the audits were of its subsidiaries.  DRPSAMF ¶ 5.  It then admits that VCG-owned clubs were subject of DOL audits.  *Id.*  The Court deems the paragraph admitted.

employees, and customers to ensure the proper behavior standards are met."[9] PSAMF ¶ 48; DRPSAMF ¶ 6.  In 2009, the DOL placed VCG under a nationwide audit for all nightclub locations and for its corporate office.[10]   PSAMF ¶ 49; DRPSAMF ¶ 7.

### 5.    Paul Clement

Paul Clement was promoted in 2008 by the President of VCG from Supervisor at another PT club to Area Director of the Portland Club.[11]   PSAMF ¶ 50; DRPSAMF ¶ 8.  Michael Ocello, the President of VCG, chose Mr. Clement to travel to Portland in 2007 to recommend whether VCG should purchase the Portland Club.[12]   PSAMF ¶ 51; DRPSAMF ¶ 9.  When he testified, Mr. Clement referred to "we" when he described VCG.[13]   PSAMF ¶ 52; DRPSAMF ¶ 10.  Area

---

[9] VCG interposed a qualified response, referring to its response to paragraph 4.  DRPSAMF ¶ 6.  The Court deems the paragraph admitted.

[10] VCG interposed a qualified response, stating that "[i]n March 2009, the DOL commenced a nationwide audit of all VCG-owned clubs, and in August 2009, all locations completed a self-audit." DRPSAMF ¶ 7.  As the Court is required to view the facts in the light most favorable to the Plaintiffs, the Court treats the paragraph as admitted.

[11] VCG interposed a qualified response, acknowledging that Mr. Clement was promoted by Michael Ocello, who is President of VCG, but who is also President of KenKev and IEC.  DRPSAMF ¶ 8.  VCG says that it was in his capacity as President of KenKev and IEC that Mr. Ocello promoted Mr. Clement, not in his capacity as President of VCG.  *Id.*  As the Court is required to view the facts in the light most favorable to the Plaintiffs, the Court included the Plaintiffs' paragraph 8.

[12] VCG interposed a qualified response, stating that Mr. Clement traveled to Portland two weeks or so before the purchase, that it was in his capacity as President of IEC that Mr. Ocello sent Mr. Clement, and that VCG does not employ anyone.  DRPSAMF ¶ 9.  The qualification as to the timing of the visit does not contradict Plaintiffs' paragraph 51.  As regards the other qualified responses, as the Court is required to view the facts in the light most favorable to the Plaintiffs, the Court included the Plaintiffs' paragraph 9.

[13] VCG interposed a qualified response, asserting that "Mr. Clement testified that VCG purchased the [C]lub." DRPSAMF ¶ 10.  The Court interprets VCG's response as denying that Mr. Clement used the pronoun "we" when describing who purchased the Portland Club.  The Court reviewed the Clement transcript and notes that the following interchange took place on page 7:

Q.  And what's the significance of that date?

A.  It's the date that we purchased the club.

7

Director Paul Clement has constant legal and administrative conversations with VCG's corporate office.[14]   PSAMF ¶ 53; DRPSAMF ¶ 11.

Along with VCG, the Area Director is responsible for all day-to-day managerial activities, such as hiring and firing, establishing policies and procedures and management of all employees, including persons with job duties similar to the named Plaintiffs at the Portland Club.[15]   DSMF ¶ 10; PRDSMF ¶ 10.   Mr. Clement likened his position of Area Director to Chief of Operations.[16]   DSMF ¶ 11; PRDSMF ¶ 11.   Mr. Clement testified that he was responsible for hiring and firing, revising employee policies, and maintaining records for his employees; he also said that he had the authority to pay invoices directly.[17]   *Id.*   At the suggestion of people at VCG

---

Q.  And when you say "we," do you mean VCG?

A.  That's the date that VCG purchased the club.

DSMF Attach. 3, *Clement Dep.* 7:17-20 (*Clement Dep.*).  In view of this exchange, the Plaintiffs' statement that Mr. Clement used "we" when referring to VCG is indisputable.  The Court refuses to accept VCG's qualified response and deems the statement admitted.

[14] VCG denied this statement, contending that Mr. Clement testified that he consulted with Mr. Ocello in his capacity as the President of KenKev II and IEC and that he had "very occasional" contact with Marty Danner who was employed by IEC.  DRPSAMF ¶ 11.  Because Mr. Ocello is President of VCG and because the Court is required to view the facts in the light most favorable to the Plaintiffs, the Court included the statement.

[15] VCG's statement excluded the first phrase—"along with VCG."  DSMF ¶ 10.  The Plaintiffs interposed a qualified objection on the ground that VCG exercised similar responsibilities.  PRDSMF ¶ 10.  As the Court is required to view the facts in the light most favorable to the Plaintiffs, the Court included the Plaintiffs' additional statement.

[16] The Plaintiffs objected to VCG's paragraph 11 on the ground that it violates the Local Rule.  PRDSMF ¶ 11.  The Court overrules the Plaintiffs' objection.

Next, the Plaintiffs denied this paragraph but their denial is not directed to the first statement, which is corroborated by the citation to Mr. Clement's deposition.  PRDSMF ¶ 11.  The Court included the first statement.

[17] The Plaintiffs' denial of this statement in the paragraph is not based on their assertion that Mr. Clement did not so testify.  In fact, he did.  They deny the paragraph because Mr. Clement's testimony does not include VCG's involvement in his job performance.  PRDSMF ¶ 11.  Because VCG's paragraph is supported by its record citation and because the fact that he had these responsibilities does not mean that VCG did not share in them, the Court included this portion of VCG's paragraph.

or IEC and to make the Portland Club's tipping policy consistent with other clubs, Mr. Clement changed the tipping policy as it relates to managers, emcees, and doormen and the emcees' compensation from shift pay to tipped minimum wages.[18] *Id.* The Portland Club had its own forms manual, which was provided by Ms. Danner,[19] and his managers were responsible for running the shifts, overseeing particular departments, and handling the paperwork and tracking monies.[20] *Id.*

### 6. The Portland Club and VCG

The Portland Club uses a Form Book prepared by the corporate office of VCG and provided by Ms. Danner, the Human Resources Director for VCG.[21] PSAMF ¶

---

[18] VCG's paragraph did not include the introductory phrase. DSMF ¶ 11. However, the Plaintiffs pointed out in their response that Mr. Clement testified that he had made the change in the tipping policy at the suggestion of the corporate office in Colorado and to make the Portland Club's tipping policy consistent with that of other clubs. PRDSMF ¶ 11. The Court reviewed the cited portion of Mr. Clement's testimony and agrees with the Plaintiffs. *Clement Dep.* 27:18-28:9. It has therefore added the Plaintiffs' additional information to VCG's paragraph.

[19] VCG's paragraph stated only that the Portland Club had its own forms manual. DSMF ¶ 11. The Plaintiffs asserted in response that the forms manual came from Ms. Danner, citing a different part of Mr. Clement's deposition. PRDSMF ¶ 11. The Court reviewed both cited portions of Mr. Clement's deposition and could not determine whether Mr. Clement was speaking about the same manual in both places. Furthermore, VCG's position on this paragraph appears to conflict with its position in response to Plaintiffs' additional statement of fact paragraph 54. Accordingly, because it is the Court's obligation to view the evidence in the light most favorable to the Plaintiffs, it has included the Plaintiffs' version.

[20] VCG's paragraph 12 asserts that VCG never controlled the terms and conditions of the Plaintiffs' work, established Plaintiffs' schedule, directed the method and manner of their work, or engaged in the hiring, firing, and disciplining of Plaintiffs. DSMF ¶ 12. The Plaintiffs denied this paragraph. PRDSMF ¶ 12. In accordance with the Court's obligation to view the facts in the light most favorable to the Plaintiffs, the Court excluded it.

[21] VCG interposed a qualified response and a denial to this paragraph, noting that Mr. Clement testified that IEC provided the Form Book and that Ms. Danner is the Human Relations Director of IEC. DRPSAMF ¶ 12.

The Court reviewed the portions of the Clement transcript that the Plaintiffs cited and agrees with VCG. Mr. Clement does not say that VCG supplied the Form Book or that Ms. Danner was the Human Resources Director for VCG; he says the Form Book came from Ms. Danner and that Ms. Danner was the Human Resources Director for IEC. *Clement Dep.* 42:15-20. In addition, the Plaintiffs cite page 81 of Mr. Clement's deposition transcript but the Court could not locate page 81 in the excerpts of the Clement deposition that was filed.

54; DRPSAMF ¶ 12.   Ms. Danner handles the payroll for employees of the Portland

Club.[22]   PSAMF ¶ 55; DRPSAMF ¶ 13.   The accountants for the Portland Club work

in Denver, Colorado at the corporate offices.[23]   PSAMF ¶ 56; DRPSAMF ¶14.   The

corporate office writes checks and pays bills for the Portland operation.   PSAMF ¶

57; DRPSAMF ¶ 15.

Trainers from the corporate offices in Denver, Colorado conducted sexual

harassment training of the Portland Club's employees.[24]   PSAMF ¶ 58; DRPSAMF

¶ 16.   At least one trainer came from a club owned by VCG to conduct other training

---

Nevertheless, because in support of their paragraph 64, the Plaintiffs cite emails from Ms. Danner in which she identifies herself as the "Director of Human Resources and Payroll" for "VCG Holding Corp.," the Court rejects VCG's qualified response and denial.

[22] The Plaintiffs' paragraph 55 asserts that Ms. Danner was "of VCG."   PSAMF ¶ 55.   VCG has interposed a qualified response, noting that IEC, not VCG, employed Ms. Danner.   DRPSAMF ¶ 13. The Court reviewed the excerpt of the Clement deposition that the Plaintiffs cited and agrees with VCG that Mr. Clement does not state by whom Ms. Danner was employed.   *Clement Dep.* 46:2-8. The Court altered Plaintiffs' paragraph 55 to reflect the record citation by eliminating the reference to Ms. Danner's employer.

[23] The Plaintiffs' paragraph 56 stated that the accountants for the Portland Club work in Denver, Colorado at the corporate offices.   PSAMF ¶ 54.   VCG interposed a qualified response to this statement, contending that Mr. Clement only testified that the accountants for the Portland Club are located in Denver.   DRPSAMF ¶ 14.   The Court reviewed the portion of the Clement transcript that the Plaintiffs provided and agrees with VCG that the transcript does not say that the accountants worked at the corporate offices.

> Q.   And who is the accountant for your Portland operation?
>
> A.   Tenicia Bradley and Heather Smith, I guess, share those responsibilities.
>
> Q.   And who - - where do they work?
>
> A.   In Denver, Colorado.

*Clement Dep.* 48:7-12.   However, in the very next paragraph, VCG admitted that the corporate office writes checks and pays bills for the Portland operation and the transcript reflects that Mr. Clement sends bills to and receives checks from Ms. Bradley and Ms. Smith.   Accordingly, the Court included the full paragraph 56.

[24] VCG interposed a qualified response, noting that either Duke Dearing, operations supervisor for IEC, or Mark Ginkel, trainer for IEC, conducted sexual harassment training.   DRPSAMF ¶ 16. Viewing the facts in the light most favorable to the Plaintiffs, the Court views "corporate office" as broad enough to capture IEC.

of Portland Club employees.[25]  PSAMF ¶ 59; DRPSAMF ¶ 17.  The form used for the orientation of new employees is a document prepared by the corporate office.[26]  PSAMF ¶ 60; DRPSAMF ¶ 18.

All Portland Club employees are invited to call upon the President of VCG when they feel it is appropriate about employment or other problems.[27]  PSAMF ¶ 61; DRPSAMF ¶ 19.  Conference calls among the Area Directors and Mr. Ocello, President of VCG, happen regularly and concern personnel matters, such as "how to handle employees."[28]  PSAMF ¶ 62; DRPSAMF ¶ 20.  VCG's former counsel admits that it "operates premium adult entertainment establishments throughout the

---

[25] VCG interposed a qualified response, admitting that Mr. Clement testified he conducted tip training and that various other people conduct the defensive tactics training.  DRPSAMF ¶ 17.  VCG then cites a portion of Mr. Clement's testimony in which he says that an employee from one other club came to Portland to perform tips training.  *Id.*  If VCG's point is that Mr. Clement confirms one person from another club, the Court agrees and has altered the Plaintiffs' statement to reflect that at least one employee from another VCG-owned club came to Portland to train Portland Club employees.

[26] VCG interposed a qualified response, noting that Mr. Clement testified that he received the form from IEC.  DRPSAMF ¶ 18.  The Court views the term "corporate office" as broad enough to include IEC and as it is obligated to view the facts in the light most favorable to the Plaintiffs, it included the paragraph.

[27] VCG interposed a qualified response, noting that Mr. Ocello was President of KenKev and IEC as well.  DRPSAMF ¶ 19.  As the Court is required to view the facts in the light most favorable to the Plaintiffs and as Mr. Ocello is also President of VCG, the Court included the paragraph.

[28] VCG interposed a qualified response, noting that Mr. Ocello usually, but not always, attends, and offering Mr. Ocello's recollection of the topics.  DRPSAMF ¶ 20.  The Court rejects VCG's qualified response.  Plaintiffs' paragraph 62 does not assert that Mr. Ocello always attends the telephone conferences and Mr. Ocello's recollection of the topics does not contradict the Plaintiffs' statement.

Country."[29]  PSAMF ¶ 63; DRPSAMF ¶ 21.  Repeated emails between VCG and the Portland Club show close coordination.[30]  PSAMF ¶ 64; DRPSAMF ¶ 22.

Mr. Prindle testified that he only saw Michael Ocello at the Portland Club meeting with Mr. Clement on two occasions and he does not know who processed his payroll; he never had any dealings with anyone from Colorado or St. Louis; he does not know the relationship among IEC, VCG, or KenKev; he does not know Marty Danner; he never had dealings with VCG or IEC.  DSMF ¶ 13; PRDSMF ¶ 13.  Mr. Johnson testified that he only met Mr. Ocello once at the Portland Club and that Mr. Ocello never gave him any instructions on how to do his job.  DSMF ¶ 14; PRDSMF ¶ 14.

### 7.    International Entertainment Consultants

Although the record indicates that VCG's wholly-owned subsidiary, International Entertainment Consultants (IEC), provides management and administrative services to the VCG-owned clubs and to non-owned affiliated clubs, in such areas as compliance, accounting, tax and payroll, IEC properly maintains separate corporate records and is a solvent company with adequate capitalization.[31]

---

[29] VCG denied this paragraph, quoting the entire sentence:  "The Company, through its various subsidiaries, owns and operates premium adult entertainment establishments throughout the Country."  DRPSAMF ¶ 21.  The Court refuses to accept VCG's denial.  Viewing the facts in the light most favorable to the Plaintiffs, the term "it" is broad enough to include VCG subsidiaries.

[30] VCG interposed a qualified response, stating that the email demonstrates the types of administrative and consulting contact between IEC and the VCG-owned clubs.  DRPSAMF ¶ 22.  The Court rejects VCG's qualified response, because in the emails, Ms. Danner identifies herself as the Director of Human Resources and Payroll for "VCG Holding Corp."  PSAMF Attach. 1 *Collection of Emails*.

[31] The Plaintiffs objected to VCG's paragraph 15 as violating the Local Rules.  PRDSMF ¶ 15.  The Court overrules the Plaintiffs' objection.  The Plaintiffs denied this statement; however, a close review of their denial confirms that they are not denying IEC's separate corporate structure.

DSMF ¶ 15; PRDSMF ¶ 15.  Mr. Clement testified that IEC would assist him in keeping his employees trained and compliant with state and federal laws; however, he would personally conduct the alcohol training because he was certified in that particular area.[32]  *Id.*

Mr. Ocello is the President of IEC and Mr. Clement testified that he consulted, as needed, with Mr. Ocello, both as an officer of KenKev and IEC, regarding Club matters.[33]  DSMF ¶ 16; PRDSMF ¶ 16.   Mr. Clement described his contact with Mr. Ocello as infrequent—maybe once a week through text messages. *Id.*  Mr. Clement felt he was accountable to Mr. Ocello as a director of KenKev.  *Id.* He identified the directors of KenKev as being above him in the chain of command. *Id.*

Marty Danner is employed by IEC and is the Director of Payroll and Human Resources.[34]   DSMF  ¶  17;  PRDSMF  ¶  17.   Ms.  Danner  was  responsible  for processing payroll for the Portland Club.  *Id.*  Mr. Clement describes his contact

---

PRDSMF ¶ 15.  The Plaintiffs instead focus on VCG's assertion that IEC is not involved in the day-to-day operations of the clubs.  *Id.*  The Court excluded that portion of VCG's statement.

[32] The Plaintiffs generally denied this statement, but the ground for the denial is their contention that IEC is involved in the day-to-day operations of the clubs.  PRDSMF ¶ 15.  The Local Rule requires that the non-movant "support each denial . . . by a record citation."  D. ME. LOC. R. 56(c).  To the extent the Plaintiffs failed to support their general denial with a record citation, the Court has deemed the statement admitted.

[33] The Plaintiffs objected to VCG's paragraph 16 on the ground that it violates the Local Rule. PRDSMF ¶ 16.  The Court overrules the Plaintiffs' objection.

The Plaintiffs interposed a general denial to VCG's paragraph 16.  The Local Rule requires that the non-movant "support each denial . . . by a record citation."  D. ME. LOC. R. 56(c).  To the extent the Plaintiffs failed to support their general denial with a record citation, the Court deemed the statements admitted.   In this paragraph, the Plaintiffs properly denied the assertion that "Mr. Clement did not deal with anyone from VCG" and the Court has not included that statement.

[34] The Plaintiffs interposed a qualified response, observing that Ms. Danner is also employed by VCG.  PRDSMF ¶ 17.  The Court declines to accept the qualified response.  The fact Ms. Danner is employed by IEC does not exclude her concurrent employment with VCG.

13

with her as "very occasional" (*i.e.*, once a month or once every six weeks) and only when a manager had a question concerning payroll.  *Id.*

### 8.   Emcees, Entertainers and Customers

Entertainers lease space from the clubs pursuant to a written lease agreement.[35]   DSMF ¶ 18; PRDSMF ¶ 18.   Mr. Johnson testified that the entertainers called themselves independent contractors and that he was aware that the entertainers had an agreement with the Portland Club, allowing them to perform for the customers.  *Id.*  The entertainers retain all tips and are not required to share their tips, in whole or in part, with the Portland Club or any employees of the club.[36]  DSMF ¶ 19; DRPSMF ¶ 19.  Both Plaintiffs testified that it is customary for entertainers to tip emcees in the adult entertainment industry and that those entertainers' tips constitute the most significant portion of their compensation.  DSMF ¶ 20; PRDSMF ¶ 20.  It is within the sole discretion of the entertainer whether and how much to tip the emcees and, as such, the amount of the

---

[35] The Plaintiffs objected to VCG's paragraph 18 as violating the Local Rule.  PRDSMF ¶ 18.  The Court overrules the objection.

The Plaintiffs interposed a general denial to VCG's paragraph 18.  The Local Rule requires that the non-movant "support each denial . . . by a record citation."  D. ME. LOC. R. 56(c).  To the extent the Plaintiffs failed to support their general denial with a record citation, the Court deemed the statements admitted.  In this paragraph, the Plaintiffs properly denied the assertions: "Therefore, Plaintiffs do not dispute that the entertainers are not employed by the [C]lub.  Notably, however, Plaintiffs refuse to consider them customers.  They simply leave unanswered how the entertainers' tips should be treated under the FLSA."  DSMF ¶ 18.  These assertions are argumentative, not statements of fact.  The Court has not included them.

[36] The Plaintiffs interposed a qualified response, stating that the employer "suggests" to the entertainers at orientation that it is customary to share their tips with the DJ.  PRDSMF ¶ 19.  This statement does not contradict VCG's paragraph 19 and the Court included VCG's statement.

entertainers' tips varies.[37]  DSMF ¶ 21; PRDSMF ¶ 21.  The better the job an emcee

did for the entertainer, the more appreciative she would be.  *Id.*

Entertainers tip emcees for the services they provide to them.[38]  DSMF ¶ 22;

PRDSMF ¶ 22.  Entertainers rely upon the emcees to promote them and set the

overall mood in the club.  *Id.*  Emcees are also responsible for the rotation of the

entertainers, introducing them on stage, supplying and playing music, controlling

lights, announcing promotions, and getting the customers interested in the

entertainers and their stage performances.  *Id.*  Mr. Prindle testified that, except for

the entertainers, emcees have the most communication with club customers.  *Id.*

Plaintiffs agree that all of their responsibilities directly benefit the club

customers as well as the entertainers and an emcee's performance affects

entertainers' earnings.   DSMF ¶ 23; PRDSMF ¶ 23.   For example, some

entertainers would receive substantial tips on stage because, in part, of the interest

that the DJ generated in their particular performances.  *Id.*

The deejay booth at the Portland Club is located in the front of the house,

adjacent to the main stage.[39]  DSMF ¶ 24; PRDSMF ¶ 24.  The booth is surrounded

---

[37] The Plaintiffs interposed a qualified response, stating that VCG paragraph 21 is repetitive with its paragraph 19.  PRDSMF ¶ 21.  The Court eliminated the portions of VCG paragraph 21 already included in this statement of facts.

[38] The Plaintiffs objected to VCG's paragraph 22 as violating the Local Rule.  PRDSMF ¶ 22.  The Court overrules their objection.

The Plaintiffs interposed a general denial to VCG's paragraph 18.  The Local Rule requires that the non-movant "support each denial . . . by a record citation."  D. ME. LOC. R. 56(c).  To the extent the Plaintiffs failed to support their general denial with a record citation, the Court deemed the statements admitted.

[39] The Plaintiffs interposed a qualified response, noting that they were admitting this paragraph as to the Portland Club only.  PRDSMF ¶ 24.  The Court limited the paragraph accordingly.

by glass windows on three sides and the entrance to the booth is on the backside, always open, and accessible to the public.  *Id.*

Emcees are not required to share their tips and the Portland Club does not retain any portion of the tips.  DSMF ¶ 25; PRDSMF ¶ 25.  The Portland Club does not have a mandatory tip pool.  DSMF ¶ 26; PRDSMF ¶ 26.  The Plaintiffs signed a tip Reporting Policy and understood that they were required to report all tips to the Portland Club.  DSMF ¶ 27; PRDSMF ¶ 27.  The Plaintiffs admit that the Portland Club placed posters in the club setting forth minimum wage and tipped minimum wage in a place frequented by employees.[40]  DSMF ¶ 28; PRDSMF ¶ 28.  The Plaintiffs admit that the posters shown to them at their depositions are substantially similar to the ones posted at the Portland Club during their employment.  *Id.*  The Plaintiffs reported customer tips and money they received from entertainers on their tax returns.[41]  DSMF ¶ 29; PRDSMF ¶ 29.

In January and February 2008, Mr. Clement said that he held a meeting for all P.T. employees to explain that the employees who received tips were going to be paid a tipped minimum wage and that the Government required them to report 100% of their tips.[42]  DSMF ¶ 30; PRDSMF ¶ 30.  He explained to his employees

---

[40] VCG's paragraph 28 asserted that such posters were posted throughout the Portland Club.  DSMF ¶ 28.  The Plaintiffs admitted that the posters were only posted in one place.  PRDSMF ¶ 28.  The Court amended the paragraph to reflect the Plaintiffs' qualified response.

[41] The Plaintiffs interposed a qualified objection, stating that they reported money they received from entertainers but denying that they should be characterized as tips.  PRDSMF ¶ 29.  The Court amended VCG's statement accordingly.

[42] The Plaintiffs denied VCG's paragraph 30 in its entirety.  PRDSMF ¶ 30.  In support of their denial, they cited pages 119 through 120 of Mr. Prindle's deposition.  *Id.*  Although portions of Mr. Prindle's deposition were filed, pages 119 and 120 were not and the Court could not determine why the Plaintiffs were denying the paragraph.  Most likely, the Plaintiffs deny that the meetings took

that the Portland Club was allowed to take a tip credit of 50% of the minimum wage; however, the Portland Club was required to guarantee that they would be paid minimum wage. *Id.* He further explained that the reason for the change from shift pay to tipped minimum wage for emcees was because the shift pay did not account for those employees who were working over 40 hours per week and entitled to overtime wages. *Id.*

### 9. Brian Prindle's Experience

Brian Prindle has worked as a DJ in the adult entertainment industry for 15 years. DSMF ¶ 31; PRDSMF ¶ 31. In about 2001, Mr. Prindle began working at Platinum Plus and continued to work there until after P.T.'s acquired the Portland Club. *Id.* Mr. Prindle is currently emceeing at another adult entertainment nightclub, Ten's, in Massachusetts. DSMF ¶ 32; PRDSMF ¶ 32. Although he performs the same job functions as he performed at P.T.'s, his compensation at Ten's is exclusively dependent upon tips from the entertainers. *Id.* At Platinum Plus, he received $50 per shift plus tips from the entertainers. DSMF ¶ 33; PRDSMF ¶ 33. Once P.T.'s acquired the Portland Club, he continued to work the same shifts, averaging about 35 hours per week, and the pay structure remained the same for the first six months. *Id.* Thereafter, his pay structure changed from shift pay to $3.50 hourly and he was now required to report tips to the Portland Club. *Id.* On average, Mr. Prindle made $300 to $400 in tips per week and including his regular pay made about $12.07 per hour. DSMF ¶ 34; PRDSMF ¶ 34.

place but they cannot in good faith deny that Mr. Clement testified that the meetings took place. Accordingly, the Court included VCG paragraph 30 but only to reflect what Mr. Clement stated during his deposition.

Mr. Prindle admits that he received more than $7.25 per hour in wages, including tips, and more than $30 in tips per month.  DSMF ¶ 35; PRDSMF ¶ 35. Mr. Prindle cannot answer why he believes that he was paid improperly at the Portland Club.[43]  *Id.*  Before working at Platinum Plus and P.T.'s, Mr. Prindle worked as a deejay at Tiffany's Cabaret in Memphis, Tennessee for 4 years before P.T.'s purchased that club.  DSMF ¶ 36; PRDSMF ¶ 36.  At Tiffany's, entertainers were not employees.  *Id.*  He was compensated through wages and tips from entertainers.  *Id.*  Again, the pay structure changed when P.T.'s took over the club. *Id.*  He received lower wages and was required to report his tips.  *Id.*  Thereafter, in about 2000, Mr. Prindle worked at The Gold Rush and its sister club, The Pink Pony, in Miami, Florida.  DSMF ¶ 37; PRDSMF ¶ 37.  Mr. Prindle testified that based on his 15 years of experience working as an emcee in the adult entertainment industry, he is not aware of any club in the industry that pays emcees minimum wage.  DSMF ¶ 38; PRDSMF ¶ 38.

### 10. Ernest Johnson's Experience

Ernest Johnson worked at the Portland Club from September 2006 to July 2010.  DSMF ¶ 39; PRDSMF ¶ 39.  At that time, Adam Currier, a former manager, explained his compensation as including wages in the amount of $3.75 per hour, plus tips from the customers.  DSMF ¶ 40; PRDSMF ¶ 40.  Mr. Johnson generally received between $300 and $400 a week in tips from entertainers and made between $13.12 to $16.25 per hour, including tips.  DSMF ¶ 41; PRDSMF ¶ 41.  At

---

[43] VCG's statement begins with the word, "Significantly."  DSMF ¶ 35.  The Court excluded the word because the statement must contain only facts, not argument.

no time during his employment did Mr. Johnson believe that his compensation as an emcee was unlawful.  DSMF ¶ 42; PRDSMF ¶ 42.

### C.    The Plaintiffs' Motion: The Facts[44]

Ernest E. Johnson, III and Brian S. Prindle were formerly employed as disc jockeys (emcees) by KenKev II, Inc., d/b/a PT's Showclub Portland (P.T.'s or the Portland Club), an adult entertainment nightclub owned by VCG Holding Corp. in Portland, Maine.[45]  DSAMF ¶ 1; PRDSMF ¶ 1.[46]

#### 1.    Emcees Regularly and Customarily Receive Tips From Entertainers

VCG does not regard the dancers as its employees and does not compensate them for their services as employees.  PSMF ¶ 4; DRPSMF ¶ 4.  VCG regards the dancers as entertainers for the patrons.  PSMF ¶ 8; DRPSMF ¶ 8.  Entertainers lease space from the clubs pursuant to a written lease agreement.[47]  PSMF ¶ 6; DRPSMF ¶ 6; DSAMF ¶ 3; PRDSMF ¶ 18.[48]  Mr. Prindle always understood

---

[44] In accordance with "conventional summary judgment praxis," the Court recounts the facts in the light most favorable to each non-movant's theory of the case, consistent with record support.  *Gillen v. Fallon Ambulance Serv., Inc.*, 283 F.3d 11, 17 (1st Cir. 2002).

[45] The Court has not included the next sentence of paragraph 1 and all of paragraph 2 of VCG's statement of additional material facts because they are not facts.  DSAMF ¶¶ 1-2.

[46] In paragraphs one and two of the Plaintiffs' statement of material facts, they assert that they were not customarily tipped at least $30 a month by people who came to be entertained at the club.  PSMF ¶¶ 1-2.  VCG has violated the Local Rule by refusing to admit or deny the statements.  D. ME. LOC. R. 56(c) ("The opposing statement shall admit, deny or qualify the facts by reference to each numbered paragraph . . . .").  The Court has treated VCG's response as a qualified response, admitting that the Plaintiffs' paragraph accurately sets forth what the Plaintiffs said in their depositions but denying what they said is true.  As the Court is required to view the facts in the light most favorable to the non-movant, the Court has not included these facts in its recitation of the facts material to the Plaintiffs' motion for summary judgment.

[47] The Plaintiffs denied this statement of material fact; however, as the Court is required to view the facts in the light most favorable to the non-movant, the Court included it.

[48] Instead of responding to VCG's statements of additional material fact, the Plaintiffs referred back to their responses to VCG's statement of material fact in support of VCG's motion.  *See Expedited*

entertainers to be independent contractors or lessees, which, based upon his experience, is fairly common in the adult entertainment industry.  *Id.*  Mr. Johnson testified that the entertainers called themselves independent contractors and that he was aware that the entertainers had an agreement with the club, allowing them to perform for the customers.[49]  *Id.*  VCG regards the dancers as independent contractors.[50]  PSMF ¶ 9; DRPSMF ¶ 9.  The entertainers retain all tips and are not required to share their tips, in whole or in part, with the club or with any employees of the club.[51]   DSAMF ¶ 4; PRDSMF ¶ 19.   Both Plaintiffs testified that it is customary for entertainers to tip emcees in the adult entertainment industry and

---

*Mot.*  Although the Court allowed them to do so, the Plaintiffs' procedure has complicated the telling of the facts here.  This is because, even though many of the statements in VCG's statement of material facts are identical to VCG's statements of additional material facts, the numbering is not.  Accordingly, instead of the Plaintiffs' responses tracking VCG's statement of additional material facts, the Court has been required to reference back to VCG's statement of facts in support of its motion, compare VCG's statements to make sure they are identical, refer to the Plaintiffs' response to VCG's statement of material facts, and transpose those responses to what the Plaintiffs would have responded to VCG's statement of additional material facts if the Plaintiffs had responded to VCG's statement of additional material facts.  If the two VCG statements were truly identical, as the Plaintiffs represented, their motion would have made some sense.  But as the two statements are numbered differently, the Court has been required to sort through the statements, expending more effort than it would have taken the Plaintiffs to follow the usual procedure.  In any event, because of the different numbering systems, the Court is referencing the numbering of the Plaintiffs' response to VCG's statement of material facts in support of its motion, which does not correspond to VCG's numbering of its statement of additional material facts.

[49] The Court has not included the last three sentences of VCG's paragraph 3 because they are not facts.

[50] VCG said it could neither admit nor deny this statement because it called for a legal conclusion.  DRPSMF ¶ 9.   The Court disagrees.   The statement asserts a fact—how VCG regards the entertainers; it does not assert a legal conclusion that the entertainers are as a matter of law independent contractors.   The Court included the paragraph since VCG has not properly controverted it.

[51] The Plaintiffs interposed a qualified response, noting that the employer "suggests" to the entertainers at orientation that it is customary to share their tips with the DJ.  PRDSMF ¶ 19.  As the Court is required to view the facts in the light most favorable to the non-movant, the Court included this paragraph.

that those entertainers' tips constitute the most significant portion of their compensation.  DSAMF ¶ 5; PRDSMF ¶ 20.

Entertainers are not required to tip emcees.[52]  DSAMF ¶ 6; PRDSMF ¶ 21.  It is within the sole discretion of the entertainer whether and how much to tip them.  *Id.*  As such, the amount of the entertainers' tip varies; the better the job that an emcee did for an entertainer, the more appreciative she would be.  *Id.*

Entertainers tip emcees for the services they provide to them.[53]  DSAMF ¶ 7; PRDSMF ¶ 22.  Entertainers rely upon the emcees to promote them and set the overall mood of the club.  *Id.*  Emcees are also responsible for the rotation of the entertainers, introducing them on stage, supplying and playing music, controlling lights, announcing promotions, and getting the customers interested in the entertainers and their stage performances.  *Id.*  With respect to club customers, Mr. Prindle testified that except for entertainers, emcees have the most communication with the club customers.  *Id.*  Plaintiffs agree that all of their responsibilities directly benefit the club customers as well as the entertainers and an emcee's performance affects entertainers' earnings.  DSAMF ¶ 8; PRDSMF ¶ 23.

The deejay booth at the Portland Club is located in the front of the house, adjacent to the main stage.[54]  DSAMF ¶ 9; PRDSMF ¶ 24.  The booth is surrounded

---

[52] The Plaintiffs interposed a qualified response, asserting that the paragraph was repetitive.  PRDSMF ¶ 21.  As the Court is required to view the facts in the light most favorable to the non-movant, the Court included the paragraph.

[53] The Plaintiffs denied this paragraph and objected on the ground that it violates Local Rule 56(b).  PRDSMF ¶ 22.  The Court overrules the objection and, as the Court is required to view the facts in the light most favorable to the non-movant, the Court included this paragraph.

[54] The Plaintiffs admitted this statement only as regards the Portland facility.  PRDSMF ¶ 24.  In additional statement paragraph one, VCG stipulated that when referring to the Portland facility, it

by glass windows on three sides and the entrance to the booth is on the backside, always open and accessible to the public. *Id.*

Emcees are not required to share their tips and the Portland Club does not retain any portion of the tips. DSAMF ¶ 10; PRDSMF ¶ 25. The Portland Club does not have a mandatory tip pool. DSAMF ¶ 11; PRDSMF ¶ 26. The supervisor of both Plaintiffs has no knowledge about how many tips the Plaintiffs received directly from the customers who came to be entertained at VCG's Club. PSMF ¶ 3; DRPSMF ¶ 3. Plaintiffs admit to signing a Tip Reporting Policy and to understanding that they were required to report all tips to the Portland Club. DSAMF ¶ 12; PRDSMF ¶ 27. Plaintiffs admit that posters setting forth minimum wage and tipped minimum wages are posted throughout the Portland Club in places frequented by employees.[55] DSAMF ¶ 13; PRDSMF ¶ 28. The Plaintiffs admit that the posters shown to them at their depositions are substantially similar to the ones posted at the Portland Club during their employment. *Id.* The Plaintiffs admit to reporting tips as wages on their tax returns.[56] DSAMF ¶ 14; PRDSMF ¶ 29.

---

would use Club or P.T.'s and as Club in this sentence is capitalized, the Court considers the paragraph to refer only to the Portland facility. Although in other instances where the statement seems to refer only to the Portland facility, club is not capitalized. The Court has capitalized Club when it is apparent that it is referring to the Portland facility.

[55] The Plaintiffs admitted that there were posters as described in the Portland Club and that the posters at the deposition were similar to the ones that were posted. PRDSMF ¶ 28. However, the Plaintiffs denied that the posters were posted throughout the Portland Club and say they were posted only in one place. *Id.* The Court reviewed the cited portions of the Plaintiffs' depositions and concludes there is enough ambiguity to support the statement, viewing the evidence in the light most favorable to VCG.

[56] The Plaintiffs interposed a qualified response, noting that they deny that the term "tip" includes monies given to them by the entertainers. PRDSMF ¶ 29. As the Court is required to view the evidence in the light most favorable to the non-movant, it has included the paragraph to the extent it is a statement of fact. It has not considered the use of the term to be a statement of law.

Mr. Clement testified that he held a meeting in January and February of 2008 for all employees at P.T.'s to explain that the employees who received tips were going to be paid a tipped minimum wage and that the Government required them to report 100% of their tips.[57]   DSAMF ¶ 15; PRDSMF ¶ 30.   He explained to his employees that the Portland Club was allowed to take a tip credit of 50% of the minimum wage; however, the club was required to guarantee that they would be paid minimum wage.   *Id.*   He further explained that the reason for the change from shift pay to tipped minimum wage for emcees was because the shift pay did not account for those employees who were working over 40 hours per week and entitled to overtime wages.   *Id.*

VCG included in its calculation of the minimum wage owed the Plaintiffs the alleged "tips" received by them as emcees from the entertainers.   PSMF ¶ 5; DRPSMF ¶ 5.

### 2.   Brian Prindle's Experience

Brian Prindle has worked as an emcee in the adult entertainment industry for 15 years.   DSAMF ¶ 16; PRDSMF ¶ 31.   In about 2001, Mr. Prindle began working at Platinum Plus and continued to work there until after P.T.'s acquired the Portland Club.   *Id.*   Mr. Prindle is currently emceeing at another adult entertainment nightclub, Ten's, in Massachusetts.   DSAMF ¶ 17; PRDSMF ¶ 32. Although he performs the same job functions as he performed at P.T.'s, his compensation at Ten's is exclusively dependent upon tips from the entertainers.   *Id.*

---

[57] The Plaintiffs denied this paragraph but as the Court is required to view the evidence in the light most favorable to the non-movant, the Court included it.

At Platinum Plus, he received $50 per shift plus tips from the entertainers. DSAMF ¶ 18; PRDSMF ¶ 33.  Once P.T.'s acquired the Portland Club, he continued to work the same shifts, averaging about 35 hours per week, and the pay structure remained the same for the first six months.  *Id.*  Thereafter, his pay structure changed from shift pay to $3.50 hourly and he was now required to report tips to the Portland Club.  *Id.*; PSMF ¶ 13; DRPSMF ¶ 13.  On average, Mr. Prindle made $300 to $400 in tips per week and made about $12.07 per hour including his regular pay. DSAMF ¶ 19; PRDSMF ¶ 34.

Mr. Prindle admits that he received more than $7.25 per hour in wages, including tips, and more than $30 in tips per month.  DSAMF ¶ 20; PRDSMF ¶ 35. Mr. Prindle cannot answer why he believes that he was paid improperly at the Portland Club.[58]  *Id.*  Before Platinum Plus and P.T.'s, Mr. Prindle worked as a deejay at Tiffany's Cabaret in Memphis, Tennessee for 4 years before P.T.'s purchased the club.  DSAMF ¶ 21; PRDSMF ¶ 36.  At Tiffany's, entertainers were not employees.  *Id.*  He was compensated through wages and tips from the entertainers.  *Id.*  Again, the pay structure changed when P.T.'s took over the club. *Id.*  He received lower wages and was required to report his tips.  *Id.*  Thereafter, in about 2000, Mr. Prindle worked at The Gold Rush and its sister club, The Pink Pony, in Miami, Florida.  DSAMF ¶ 22; PRDSMF ¶ 37.  Mr. Prindle testified that based on his 15 years of experience working as an emcee in the adult entertainment

---

[58] VCG's statement begins with the word, "Significantly."  DSAMF ¶ 20.  The Court has not included the word because the statement must contain only facts, not argument.

industry, he is not aware of any club in the industry that pays emcees minimum wage.  DSAMF ¶ 23; PRDSMF ¶ 38.

### 3. Ernest Johnson's Experience

Ernest Johnson worked at the Portland Club from September 2006 to July 2010.  DSAMF ¶ 24; PRDSMF ¶ 39.  At that time, Adam Currier, a former manager, explained his compensation as including wages in the amount of $3.75 per hour, plus tips from the customers.  PSMF ¶ 12; DRPSMF ¶ 12; DSAMF ¶ 25; PRDSMF ¶ 40.  Mr. Johnson generally received between $300 and $400 a week in tips from entertainers and made between $13.12 and $16.25 per hour, including tips.  DSAMF ¶ 26; PRDSMF ¶ 41.  At no time during his employment, did Mr. Johnson believe that his compensation as an emcee was unlawful.  DSAMF ¶ 27; PRDSMF ¶ 42.

## II. THE POSITIONS OF THE PARTIES

### A. VCG's Motion for Summary Judgment

#### 1. VCG's Position

VCG asserts that it is entitled to summary judgment because (1) VCG is not a proper Defendant and (2) the money given to the emcees by the entertainers is properly considered tips under the FLSA and Maine law.  *Def.'s Mot.* at 1.

##### a. VCG as Employer

In its motion, VCG contends that under its corporate structure, it is not as a matter of law the employer of either of the Plaintiffs.  *Id.* at 8-11.  Noting that there are three potential corporate entities, VCG, IEC and KenKev, it says that KenKev,

a Maine corporation, was the Plaintiffs' sole employer. *Id.* at 11. It contends that VCG is a mere holding company, which exists just to own interests in the companies that own the clubs, and that it has no employees at all. *Id.* at 10. VCG maintains that IEC, VCG's wholly-owned subsidiary, only provides management and administrative services to the clubs, including KenKev, and is not the Plaintiffs' employer. *Id.* at 11. By contrast, it argues that KenKev is the Maine corporation that employed these Maine residents at this Maine business, that KenKev was the entity that issued the Plaintiffs' W-2s, that obtained all necessary licenses and permits, that employed others at the club, including the manager, bartenders, bar-backs, waitresses, housemothers, and the emcees, and that the Area Director hired and fired the employees and performed the day-to-day management of the Portland Club. *Id.* at 10.

With these facts, VCG says that it is entitled to judgment as a matter of law that it was not the Plaintiffs' employer. VCG concedes that the FLSA contemplates there may be simultaneous employers who are responsible for FLSA compliance. *Id.* at 8. However, it argues that there is "a strong presumption that a parent corporation is not the employer of its subsidiary's employees." *Id.* (quoting *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773, 778 (5th Cir. 1997)).

VCG points out that, when interpreting § 203(d) of the FLSA, the First Circuit adopted an "economic reality" test. *Id.* at 9. It says that under that test, joint employment status may be found where (1) the entity has operational control over the enterprise which the nominal employer is a part of, or (2) the entity has

substantial control of the terms and conditions of the work of the employee. *Id.* VCG stresses that whether an entity is an employer within the meaning of the FLSA is a legal determination. *Id.* at 10.

It claims that the Plaintiffs "rely ***exclusively*** upon common ownership to establish that VCG is joint employers with KenKev and the other VCG-owned clubs." *Id.* at 9 (emphasis in original). VCG emphasizes that the Plaintiffs "argued joint employer status, ***for the first time***, in their motion for certification." *Id.* (emphasis in original). VCG maintains that under the First Circuit-mandated analysis, it simply fails to meet "any permutation of the economic reality test with regard to Plaintiffs' employment." *Id.* at 10.

### b.   Emcees Receive More Than $30.00 Per Month in Tips

On this issue, VCG contends that the money the emcees receive from the entertainers constitutes tips and, as they receive more than $30.00 per month from the entertainers, the emcees fit within the FLSA definition of "tipped employee." *Id.* at 11-15. Assuming the emcees' tips are included, VCG argues that their employer is entitled to take a "tip credit" under the FLSA. *Id.* at 12-13. VCG contends that whether the entertainers are considered the customers of the emcees or are analogized as club employees, their tips to the emcees should count. *Id.* at 16-17. Finally, VCG asserts that the emcees fit within the concept of a mandatory tip pool where servers tipped out to a maître d'. *Id.* at 17.

### c.   State Law Claims

VCG contends that Maine law provides for a tip credit against minimum wage. *Id.* at 18 (citing 26 M.R.S. § 664 subd. 2). VCG argues that because the Plaintiffs conceded that they were paid at least one-half of the minimum wage required by law and that with the tips, they were paid in excess of full minimum wage, VCG is entitled to summary judgment on the state law claim. *Id.*

### 2.   The Plaintiffs' Position

### a.   VCG as Employer

The Plaintiffs claim that they were employed by VCG Holding Corporation. *Pls.' Opp'n* at 1. They say that the evidence shows that VCG, not IEC, carried on administrative functions for the Portland Club. *Id.* They allege that VCG maintained payroll and human resource records for the Portland Club in Denver, Colorado, that Marlene (Marty) Danner had been the Director of Payroll and Human Resources for all the clubs, that the Maine retail license lists Denver as the address for the Portland Club, that VCG claimed it had approximately 925 employees in its 10-K, which it filed with the Securities and Exchange Commission, and that VCG admits it was the subject of two United States DOL audits concerning whether its employees were paid in accordance with the FLSA. *Id.* at 1-2. The Plaintiffs say that VCG has admitted "employer-like functions."[59] *Id.* at 2-3. They assert that there is a factual issue as to which entity Paul Clement was working for and whether he was enforcing VCG policies. *Id.* at 3-4. They contend

---

[59] The Plaintiffs assert that VCG reported in 2009 that its salaries and wages increased $13,781,000 from the prior year, *Pls.' Opp'n* at 2, but this figure does not appear in the statements of material fact and the Court has not considered it.

that the close coordination among the Portland Club, VCG and IEC creates a genuine issue of material fact as to who was employing whom. *Id.* at 4-6.

The Plaintiffs point out that employment under the FLSA is defined with "striking breadth." *Id.* at 7 (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 326 (1992)). Furthermore, they refer to *Baystate Alternative Staffing, Inc. v. Herman*, 163 F.3d 668 (1st Cir. 1998), as a similar case containing a division of responsibility from one corporation and another where the First Circuit focused on whether one corporation was acting in the interest of the other. *Pl.'s Opp'n* at 7-8.

### b.   The Emcees, Tips, and Maine law

The Plaintiffs contend that the "weakness of the defendant's case regarding the tip credit is shown in its attempt to argue that the dancers who perform at the Club are in fact the 'customers' of the DJs." *Id.* at 8. The Plaintiffs argue that VCG's argument amounts to its own unsupported legal theory. *Id.* at 8-9. They dismiss VCG's attempts to differentiate between federal and Maine law by saying that the Maine courts have used federal law to interpret similar state statutes. *Id.* at 9. Furthermore, they say that the record evidence in this case raises a factual question as to whether the minimum tip is entirely voluntary as the FLSA requires. *Id.* Finally, they reiterate that DOL regulations do apply to and are binding on VCG. *Id.* at 10.

### c.   VCG's Reply

In its reply, VCG turns the Plaintiffs' argument, emphasizing that it is the Plaintiffs who cite "***no authority***" to support their claim that amounts paid by

entertainers to emcees are not tips. *Def.'s Reply* at 1 (emphasis in original). VCG then addresses the issue of employment and says that the assistance to KenKev came not from VCG but from IEC. *Id.* at 2. VCG disputes the applicability of *Baystate* to this case, observing that unlike the *Baystate* employer, VCG "is not a staffing company, and there is nothing in the record to support that VCG supervised or controlled the work schedules and conditions of Plaintiffs' employment." *Id.* at 2 n.2. VCG complains that the Plaintiffs have failed to accurately cite its 10-K Report to the SEC, pointing out that the Report mentions not VCG alone but "***its subsidiaries***" as employing the 925 employees. *Id.* at 3 (emphasis in original). VCG claims that the Plaintiffs mischaracterize Paul Clement's testimony about his activities as Area Director and his relationship with Mr. Ocello and the Denver operation. *Id.* at 3-4.

Not surprisingly, VCG disagrees that its position on tipped employees is a "pure invention." *Id.* at 4. Instead, VCG insists that it is the Plaintiffs who are inventing law out of whole cloth and it restates its earlier contentions about the non-employment status of the entertainers and the importance of the emcees. *Id.* at 5-6.

### B.     The Plaintiffs' Motion for Partial Summary Judgment

#### 1.     The Plaintiffs' Position

##### a.     The Emcees and Customer Tips

The Plaintiffs first contend that VCG is not entitled as a matter of law to a tip credit for monies they received directly from club patrons. *Pl.'s Mot.* at 2. They

say that the tips from customers are too sporadic and insubstantial to satisfy the statutory test for "tipped employees." *Id.* at 3. They argue that neither of the Plaintiffs received any direct tips on a regular basis and, in any event, the total tips of such did not exceed $30 per month. *Id.* The Plaintiffs support their position by citing 29 U.S.C. § 203(m), which defines a "tipped employee" as one who "customarily and regularly" receives more than $30 a month in tips. *Id.* Although they concede that the minimum wage Maine statute does not contain an express provision that tips must come from a customer, the Plaintiffs maintain that this requirement "may be fairly implied" as the statutory intent. *Id.* at 4. They point out that the Maine Supreme Judicial Court has looked to analogous federal statutes in interpreting Maine statutes. *Id.* They urge the Court to conclude that the emcees are not "tipped employees" under either federal or state law. *Id.* at 4-5.

### b.    The Emcees and the Entertainers

The Plaintiffs then move to their main point. They contend that the Portland Club is "not entitled to a tip credit for the monies received by the plaintiff dis[c] jockeys from the dancers." *Id.* at 5. They point out that the entertainers are not Club employees, but are independent contractors, and are not paid wages. *Id.* To count as tips, the Plaintiffs say, the source must either be from the customers or from a valid tip pool. *Id.* The Plaintiffs assert that there can be no valid tip pool with the dancers because the entertainers are not employees. *Id.* To fit within the protection of the statute, the Plaintiffs maintain that VCG must comply with the statutory definitions and even if VCG could prove that the emcees "somehow end up

with an amount equal to the minimum wage," it does not count.  *Id.* at 5-6.  They support this overall point by referring to federal statutory, regulatory, and case law. *Id.* at 6-9.  They claim that the same result obtains under Maine law.  *Id.* at 10.

### 2.   VCG's Response

VCG rejects the Plaintiffs' contention that the emcees are not "tipped employees" within the meaning of the FLSA.  *Def.'s Opp'n* at 7-9.  VCG explains that because the entertainers tip the emcees freely, voluntarily, and in no set amount for services the emcees perform for them, the entertainers become for purposes of the FLSA the customers of the emcees.  *Id.* at 10-11.  VCG also observes that the emcees also directly benefit the patrons from whom they receive tips.  *Id.* at 11.  VCG dismisses the significance of the DOL's Field Operations Handbook and Opinion FLSA 2005-30 as "not binding."  *Id.*  As the Plaintiffs concede that they made in tips between $300 and $400 per week during an average 35 hour workweek from the entertainers, VCG concludes the emcees must be considered "tipped employees" under the FLSA.  *Id.* at 12.

VCG offers an alternative theory.  It says that because 29 U.S.C. § 203(m) allows tip-pooling, the Court could "analogize the entertainers to Club employees." *Id.*  It says such an analysis would "fit squarely within the well-recognized notion of a tip pool."  *Id.*  It compares emcees to hosts in a restaurant, who have been found to have sufficient contact with customers to participate in a valid tip pool.  *Id.*

Finally, VCG presses its view that it is entitled to summary judgment on the state law claims because the Maine statute does not require that the employee

receive tips from customers. *Id.* at 13-15. VCG says that the facts do not support the Plaintiffs' theory and that the FLSA preempts the state law claim in any event. *Id.* at 14-15.

### 3.   The Plaintiffs' Reply

Instead of filing a separate reply, the Plaintiffs adopted their response to VCG's motion for summary judgment as their reply, which the Court has already summarized. *Expedited Mot.* at 1-2.

## III.   LEGAL STANDARD

### A.   Summary Judgment Standard

Generally, summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The initial burden is on the moving party to show that there exists an absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). If the moving party meets this initial burden, then the non-moving party must set forth specific facts showing that there is a genuine issue for trial in order to defeat the motion. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). "[W]here the parties filed cross-motions for summary judgment, as they did here, [the Court] must determine based on the undisputed facts whether either the plaintiffs or the defendant[] deserve[s] judgment as a matter of law." *Hartford Fire Ins. Co. v. CAN Ins. Co. (Europe) Ltd.*, 633 F.3d 50, 53.

A fact is "material" if it "has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant." *McCarthy v. Nw. Airlines, Inc.*, 56 F.3d 313, 315 (1st Cir. 1995); *accord Buchanan v. Maine*, 469 F.3d 158, 166 (1st Cir. 2006); *Seaboard Sur. Co. v. Town of Greenfield*, 370 F.3d 215, 218–19 (1st Cir. 2004). An issue is genuine where "a reasonable jury could resolve the point in favor of the nonmoving party." *Tropigas de Puerto Rico, Inc. v. Certain Underwriters at Lloyd's of London.*, 637 F.3d 53, 56 (1st Cir. 2011) (quoting *McCarthy*, 56 F.3d at 315). While the Court "views the facts and draws all reasonable inferences in favor of the nonmoving party," *Ophthalmic Surgeons, Ltd. v. Paychex, Inc.*, 632 F.3d 31, 35 (1st Cir. 2011), it "afford[s] no evidentiary weight to 'conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative,'" *Tropigas de Puerto Rico, Inc.*, 637 F.3d at 56 (quoting *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st Cir. 2001)); *accord Sutliffe v. Epping Sch. Dist.*, 584 F.3d 314, 325 (1st Cir. 2009).

## B.    Federal Minimum Wage Law

"The FLSA requires that employers pay to covered employees a minimum hourly wage." *Donovan v. Agnew*, 712 F.2d 1509 (1st Cir. 1983) (citing 26 U.S.C. § 206). Enacted pursuant to Congress's constitutional authority to regulate interstate commerce, the purpose of the FLSA is "to eliminate from industries engaged in commerce or in the production of goods for commerce the existence of labor conditions detrimental to the maintenance of the minimum standard of living

34

necessary for the health, efficiency and general well-being of workers in such industries and production in order to prevent disruption of such commerce." *Bowie v. Gonzalez*, 117 F.2d 11, 16 (1st Cir. 1941). The statute "is remedial in nature and should be liberally construed." *Id.*

Accordingly, the traditional common law definition of employer does not apply to the FLSA.[60] The FLSA "contains its own definitions, comprehensive enough to require its application to many persons and working relationships, which prior to this Act, were not deemed to fall within an employer-employee category." *Walling v. Portland Terminal Co.*, 330 U.S. 148, 150-51 (1947).

The FLSA's unusually broad definition of employer "includes any person acting directly or indirectly in the interest of an employer in relation to an employee," 29 U.S.C. § 203(d), and has "been interpreted expansively," *Donovan*, 712 F.2d at 1510. Following the Supreme Court's lead, the First Circuit adopted an "economic reality" test in FLSA cases that "prevails over technical common law concepts of agency," *id.* (citing *Goldberg v. Whitaker*, 366 U.S. 28, 33 (1961)), allowing for "multiple 'employers' who are simultaneously liable for compliance with

---

[60] The Supreme Court has described the traditional common law test as follows:

> In determining whether a hired party is an employee under the general common law of agency, we consider the hiring party's right to control the manner and means by which the product is accomplished. Among the other factors relevant to this inquiry are the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party.

*Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323-24 (1992) (quoting *Cmty. For Creative Non-Violence v. Reid*, 490 U.S. 730, 751 (1989) (footnotes omitted)); *see also Speen v. Crown Clothing Corp.*, 102 F.3d 625, 631 (1st Cir. 1996).

35

the FLSA," *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 33-34 (1st Cir. 2007). This test adopts "the non-common law view . . . that 'employees are those who as a matter of economic reality are dependent upon the business to which they render service.'" *Speen v. Crown Clothing Corp.*, 102 F.3d 625, 632 (1st Cir. 1996) (quoting *Bartels v. Birmingham*, 332 U.S. 126, 130 (1947)).

The breadth and rarity of the FLSA definition of employer is demonstrated by the First Circuit's refusal to extend the FLSA definition to other remedial statutes, such as the ERISA and the Age Discrimination in Employment Act, *Speen*, 102 F.3d at 632, the Americans with Disabilities Act, *Dykes v. DePuy, Inc.*, 140 F.3d 31, 38 (1st Cir. 1998), and Title VII of the Civil Rights Act, *Alberty-Velez v. Corporacion de P.R. para la Difusion Publica*, 361 F.3d 1, 6-7 (1st Cir. 2004).[61]

## IV.    DISCUSSION

### A.    Whether VCG Employed the Plaintiffs

The Court turns first to the question of whether VCG was an "employer" of the Plaintiffs under the FLSA's definition. VCG contends that its corporate organization is neatly divided by function: VCG acts as the holding company, IEC as a human resources and administrative consultant, and KenKev as the employer. There is nothing facially improper about such a corporate organization, but whether these functional divisions are carried out in practice is another matter. In the summary judgment context, the question is whether the Plaintiffs have raised a

---

[61] The Social Security Act also uses the FLSA's expansive definition of employer. *See Speen*, 102 F.3d at 632.

36

genuine issue of material fact about whether VCG's practices blur these corporate function lines.

The parties do not dispute that the Plaintiffs were employed by KenKev, the Maine corporation that issued their W-2s.  However, that KenKev was one employer is not determinative because "[t]here may be multiple 'employers' who are simultaneously liable for compliance with the FLSA."  *Chao*, 493 F.3d at 34; *Donovan*, 712 F.2d at 1510-11.  "[T]he FLSA requires the Court to look past the legal veneer of corporate independence, and to inquire into who runs [the defendant's] nightclub as a matter of economic reality."  *Doe v. Cin-Lan, Inc.*, 4:08-cv-12719, 2009 U.S. Dist. LEXIS 72979, at *36-37 (E.D. Mich. Aug. 18, 2009).  Thus, the question remains whether VCG and IEC also employed the Plaintiffs within the FLSA's definition.[62]  The record currently before the Court reveals a substantial overlap in personnel, policies, and control among the three entities: VCG, IEC, and KenKev.

Turning first to personnel, Mr. Ocello is the President of VCG and IEC and a Director of KenKev, Ms. Danner is the Human Resources Director for VCG and IEC, and Mr. Clement is an employee of KenKev but was promoted to the position

---

[62] In support of its position that it was not an employer of the Plaintiffs, VCG cites three cases: *Donovan*, 712 F.2d 1509, *Lusk v. Foxmeyer Health Corp.*, 129 F.3d 773 (5th Cir. 1997), and *Frank v. U.S. West, Inc.*, 3 F.3d 1357 (10th Cir. 1993).  VCG quotes *Donovan* as stating that "the shield from personal liability which is one of the major purposes of doing business in a corporate form" should not be lightly disregarded.  *Def.'s Mot.* at 8-9 (quoting *Donovan*, 712 F.2d at 1513).  Yet the *Donovan* Court, applying the "economic reality" test, concluded that corporate officers in that case were properly held personally liable for the unpaid wages of their 99 hourly employees.  712 F.2d at 1514.  To the extent *Donovan* applies, it is favorable to the Plaintiffs, not to VCG.  The two remaining cases, *Lusk* and *Frank*, address whether a parent corporation can be held liable for discriminatory conduct under the ADEA and Title VII.  *See Lusk*, 129 F.3d at 775; *Frank*, 3 F.3d at 1361.  However, the law in the First Circuit is clear that the employer analysis under the ADEA and Title VII is not the same as the FLSA test, which is broader.

of Area Director by Mr. Ocello.  Because Mr. Ocello wore several hats among these three companies, there is a genuine issue of material fact as to which hat he was wearing for different duties.  *See Reich v. Circle C. Investments, Inc.*, 998 F.2d 324, 329 (5th Cir. 1993) (describing a consultant for an adult nightclub as the "driving force" behind the corporation).  Furthermore, although VCG insists that it has no employees, the record contains evidence to the contrary.  Ms. Danner's own emails describe her position as "Director of Human Resources and Payroll" for "VCG Holding Corp."[63]  Her title alone raises a genuine issue as to whether she was acting for VCG in performing her human resources duties.  As to Mr. Clement, there is no evidence in the record that KenKev owned any other businesses, particularly businesses outside of Maine, so that his title of Area Director strongly suggests a reporting relationship beyond KenKev to IEC and VCG.  There is a factual question as to whether – when Mr. Clement hired, fired, and otherwise controlled KenKev employees – he was doing so only for KenKev or for IEC and VCG, as well.  *See Cin-Lan*, 2009 U.S. Dist. LEXIS 72979, at *36-37 (denying motion for summary judgment because of complex corporate structure in adult entertainment industry, noting "the overlap in ownership and officers").

Regarding the employment policies and control of the Portland Club, the record reflects that Ms. Danner was involved in the details of the Portland Club's operations.  She supplied a Form Book that the Portland Club used and handled the payroll for the Portland Club employees.  The corporate accountants for the

---

[63] *See* notes 20, 35, 44 *supra*.

Portland Club work in Denver and the corporate office writes checks and pays bills for the Portland operation.  Conference calls among all Area Directors and Mr. Ocello happen regularly and concern personnel matters.  The Portland Club employees receive training from corporate employees and, on at least one occasion, from the employee of another club.  The Portland Club employees were invited to call on Mr. Ocello, the President of VCG, about employment or other problems when they felt it was appropriate.  The entertainers at the Portland Club lease space on a form lease that is applicable to VCG clubs generally.  Finally, in its 2009 annual report, VCG reported that it and its subsidiaries employed 925 employees, of which 135 were full-time management employees.

In arguing that VCG was, in fact, their employer for purposes of the FLSA, the Plaintiffs rely on *Baystate v. Alternative Staffing, Inc. v. Herman*, 163 F.3d 668 (1st Cir. 1998).  Even though the facts in *Baystate* differ from this case, the Court nevertheless finds its analysis useful.  There, the First Circuit addressed whether an employment agency that supplied temporary workers to other companies was the workers' employer under the FLSA.  *Id.* at 670.  To answer this question, the Court looked to four factors: whether the alleged employer (1) had the power to hire and fire the employees; (2) supervised and controlled employee work schedules or conditions of employment; (3) determined the rate and method of payment; and (4) maintained employment records.  *Id.* at 675.

Applying these factors to the record in this case, it appears that there are genuine issues of material fact on the "employer" issue that preclude summary

judgment for VCG as to that issue.  There is a genuine issue, for example, as to whether Mr. Ocello, who as President of VCG hired Mr. Clement, could also have fired him in that same capacity.  Similarly, there is a factual question as to whether Mr. Clement, whose title was Area Director, was acting for VCG, IEC, KenKev, or all three, when he hired, fired, and controlled the work schedules for Portland Club employees and established their rate and method of payment.  Finally, it is undisputed that the employment records for Portland Club employees were maintained both in Portland and in Denver, but genuine issue as to whether Ms. Danner, who was responsible for those employment records as Director of Human Resources, was acting as Director of Human Resources and Payroll for VCG Holding Corp.—as her email indicated—or as Director for IEC only in overseeing those records—as VCG insists.

In the Court's view, the available facts create several genuine issues of material fact as to whether parent company VCG should be considered the Plaintiffs' employer under the FLSA definition.  VCG's motion for summary judgment as to its corporate status as parent and not employer must fail.

### B.    How the Law Categorizes the Emcees' Tips

The parties have filed motions forming opposite sides of the same coin.  The Plaintiffs' motion for partial summary judgment is premised on the argument that the entertainers' tips to the emcees may not count as tips under the FLSA and that, when the entertainers' tips are eliminated from calculation, the emcees were underpaid under the FLSA.  VCG's motion for summary judgment is premised on

40

the argument that the entertainers' tips to the emcees do count as tips under the FLSA and, when the entertainers' tips are included in the calculus, the emcees were properly compensated under the FLSA. Furthermore, the factual differences pressed separately by the parties, viewed in the light most favorable to the non-movant, do not create meaningful distinctions. Accordingly, on this issue, the Court addresses both motions at the same time.

### 1.    The FLSA and Tips

The FLSA requires that employers pay employees a minimum hourly wage, 29 U.S.C. §§ 201 *et seq.* For tipped employees, however, the law allows employers to pay a reduced minimum wage provided they fulfill the requirements for taking a "tip credit," which is the difference between the amount an employee must be paid under minimum wage law and the amount directly paid to a tipped employee. 29 U.S.C. § 203(m). The FLSA contains specific provisions on whether and how employers are allowed to treat tips when calculating an employee's compensation, and it contains a specific definition of "tipped employee":

> "Tipped employee" means any employee engaged in an occupation in which he customarily and regularly receives more than $30 a month in tips.

29 U.S.C. § 203(t). For a "tipped employee," the law permits an employer to take a wage credit for tips under certain conditions. 29 U.S.C. § 203(m). The DOL has promulgated the following definition of "tips":

> A tip is a sum presented by a customer as a gift or gratuity in recognition of some service performed for him. It is to be distinguished from payment of a charge, if any, made for the service. Whether a tip is to be given, and its amount, are matters determined solely by the

41

customer, who has the right to determine who shall be the recipient of the gratuity. Tips are the property of the employee whether or not the employer has taken a tip credit under section 3(m) of the FLSA. The employer is prohibited from using an employee's tips, whether or not it has taken a tip credit, for any reason other than that which is statutorily permitted in section 3(m): As a credit against its minimum wage obligations to the employee, or in furtherance of a valid tip pool. Only tips actually received by an employee as money belonging to the employee may be counted in determining whether the person is a "tipped employee" within the meaning of the Act and in applying the provisions of section 3(m) which govern wage credits for tips.

29 C.F.R. § 531.52. The employer bears the burden of demonstrating that it is entitled to claim the FLSA's "tip credit." *See, e.g., Fast v. Applebee's Int'l, Inc.*, 638 F.3d 872, 882 (8th Cir. 2011) (affirming that employer bears burden to prove tip credit or other exemptions under FLSA); *Barcellona v. Tiffany English Pub, Inc.*, 597 F.2d 464, 467 (5th Cir. 1979); *Ash v. Sambodromo, LLC*, 676 F. Supp. 2d 1360, 1367 (S.D. Fla. 2009); *Bernal v. Vankar Enters., Inc.*, 579 F. Supp. 2d 804, 808 (W.D. Tex. 2008).

## 2. Entertainers as Independent Contractors

To properly characterize the entertainers' tips to the emcees, it is first necessary to properly characterize the entertainers. If the entertainers are employees, the tips may be shared with emcees provided the requirements for a "tip pool" are met. *See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.54. If the entertainers are independent contractors, the money from the entertainers to the emcees constitutes a tip. *See* 29 C.F.R. § 531.52. In this unusual case, the parties agree that the entertainers are not employees.[64] *Pls.' Mot.* at 1 ("This Memorandum shows that . .

---

[64] While the legal status of dancers at an adult entertainment nightclub is far from settled, the prevailing trend is to conclude that they are employees under the FLSA. *See, e.g., Circle C.*

. the dancers were not employees of the club"); *Def.'s Opp'n* at 6 (referring to the "uncontroverted fact that entertainers ***are not*** employees") (emphasis in original).

For purposes of ruling on this motion only, the Court accepts the agreement of the parties that the entertainers are not employees and are instead independent contractors under the FLSA. The Court intimates no view as to the status of entertainers, if squarely raised.

### 3.   Entertainers and the Tip Credit

The Court turns to the crux of this case: whether VCG is entitled to take a tip credit for tips that the entertainers, who are independent contractors, give the emcees, who are employees.[65] The Plaintiffs argue that under 29 C.F.R. § 531.51, for an employer to obtain a "tip credit," it must be the "customer" who tips the "employee." Here, the Plaintiffs claim that the entertainers, who lease space from

---

*Investments*, 998 F.2d 324; *Ruffin v. Entm't of the E. Panhandle*, No. 3:11-CV-19, 2011 U.S. Dist. LEXIS 135609 (N.D.W.V. Nov. 23, 2011); *Clincy v. Galardi South Enterprises, Inc.*, No. 1:09-CV-2082-RWS, 2011 U.S. Dist. LEXIS 100440 (N.D. Ga. Sept. 7, 2011); *Thompson v. Linda and A., Inc.*, 779 F. Supp. 2d 139 (D.D.C. 2011); *Morse v. Mer Corp.*, No. 1:08-cv-1389-WTL-JMS, 2010 U.S. Dist. LEXIS 55636 (S.D. In. Jun. 4, 2010); *Doe v. Cin-Lan, Inc.*, No. 08-cv-12719, 2010 U.S. Dist. LEXIS 16447 (E.D. Mich. Feb. 24, 2010) ; *Harrell v. Diamond A Entm't, Inc.*, 992 F. Supp. 1343 (M.D. Fla. 1997); *Reich v. ABC/York-Estes Corp.*, No. 91 C 6265, 1997 U.S. Dist. LEXIS 6874 (N.D. Ill. May 12, 1997); *Reich v. Priba Corp.*, 890 F. Supp. 586 (N.D. Tex. 1995) (finding dancers are employees under FLSA).

To be sure, there is contrary authority. *See Deja Vu-Lynnwood, Inc. v. United States*, 21 Fed. Appx. 691 (9th Cir. 2001) (concluding that the IRS's position that dancers were employees was unreasonable); *Marlar, Inc. v. United States*, 151 F.3d 962 (9th Cir. 1998); *Déjà Vu Entm't Enters. of Minn, Inc. v. United States*, 1 F. Supp. 2d 964 (D. Minn. 1998); *Taylor Blvd. Theatre, Inc. v. United States*, No. 3:97-CV-63-H, 1998 U.S. Dist. LEXIS 9355 (W.D. Ky. May 13, 1998). However, most of these cases are tax cases, where "the classification turns on the common law test of an 'employee,'" instead of the FLSA's definitions. *Marlar*, 151 F.3d at 967. As one district court noted, the FLSA cases are "decided under an entirely different legal standard." *Taylor Blvd Theatre*, 1998 U.S. Dist. LEXIS 9355, at *13 n.4 (citing *Priba*, 890 F. Supp. at 592).

[65] The record suggests that the emcees occasionally received tips directly from customers. However, the record is devoid of any suggestion that the emcees received more than $30 per month directly from the customers and VCG makes no such claim. If they did, this lawsuit would have quietly disappeared some time ago.

the employer, cannot be considered customers and that any tips the entertainers receive and then transfer to the emcees are not creditable under the FLSA.

The Plaintiffs concede that the FLSA allows tip pools. *Pls.' Mot.* at 7-8 (citing 29 C.F.R. § 531.54). The typical example, expressly described in the regulation, is a restaurant where servers and bussers share tips from patrons. *See* 29 C.F.R. § 531.54. But the Plaintiffs contend that a tip pool requires that the tips be shared among employees and does not allow tips among independent contractors and employees. They point to an Opinion Letter from the Wage and Hour Division of the DOL, which refused to allow an employer to take a credit for a 15% gratuity that was "transferred directly to the chauffer" because the gratuity was imposed and therefore not a tip. *U.S. Dep't of Labor, Emp't Standards Admin., Wage and Hour Div., Opinion Letter*, 2005 DOLWH LEXIS 38, at *1 (Sept. 2, 2005).

VCG sees it differently. It insists that the emcees receive their tips from customers, but that the customers are the entertainers. VCG emphasizes that the entertainers depend upon the services provided by the emcees to set the overall mood of the club, to energize the crowd with lively dance music (particularly when the dancers are on stage), to generate excitement when announcing individual entertainers, and generally to create a party and tipping atmosphere within the club. VCG says that the entertainers recognize the value they receive from the emcees and freely and voluntarily give tips to the emcees in exchange for the services the emcees provide. VCG maintains that, unlike the chauffer in the DOL opinion letter, the tips to emcees from entertainers are entirely voluntary. As a

44

fallback position, VCG urges the Court to analogize the arrangement between entertainers and emcees to that between servers and bussers.

### 4.    Classifying the Tips from the Entertainers

To meet the definition of "tip," the regulatory prerequisites are "strictly construed, and must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Chung v. New Silver Palace Rest.*, 246 F. Supp. 2d 220, 229 (S.D.N.Y. 2002); *Martin v. Tango's Rest., Inc.*, 696 F.2d 1319, 1323 (1st Cir. 1992) (noting that while "[i]t may at first seem odd to award back pay against an employer, doubled by liquidated damages, where the employee has actually received and retained base wages and tips that together amply satisfy the minimum wage requirements," nevertheless "Congress has in section 3(m) expressly required notice as a condition of the tip credit and the courts have enforced that requirement").

### a.    Entertainers as Customers

The regulatory definition of "tip can be broken down into several components. The first requirement under § 531.52 is that the tip must be "presented by a customer." 29 C.F.R. § 531.52.

Here, VCG makes the innovative argument that the dancers are customers of the emcees.   This way of viewing the emcee-entertainer relationship is counterintuitive.   Typically, a tipping customer, such as a restaurant patron or hotel guest, is a stranger to the internal workings of the business and has no economic stake in its success.  Furthermore, within a business, even when workers

share tips, they do not commonly view each other as customers.  But here, an entertainer is hardly an economic stranger to a club.  As the *Morse* court noted, "[e]xotic dancers are obviously essential to the success of a topless nightclub."  2010 U.S. Dist. LEXIS 55636, at *17 (quoting *Harrell*, 992 F. Supp. at 1352).

The language in the regulation does not provide a clear answer; although the regulation requires that a tip come from a "customer," the regulations do not define the term.  Nor does standard usage resolve the issue.  The dictionary definition of "customer" has two subtly distinct meanings: 1) "one who purchases some commodity or service" or 2) "one who patronizes or uses the services (as of a library, restaurant, or theater)."  WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY at 559 (2002 ed.).  The first definition is narrow and arguably would not encompass VCG's view of the entertainer-emcee relationship; the second definition is broader and could encompass VCG's position that the dancers voluntarily tipped the emcees in appreciation for the services they provided.

Although the parties have made unusually self-assured yet contrary pronouncements, they have offered no case law in either the adult entertainment industry or, by analogy, in other fields where a court has addressed tips passed from independent contractors to employees within the same business.[66]  In addition, the parties have not satisfactorily explained why their proposed treatment of the

---

[66]Among the substantial number of adult nightclub employment opinions, the Court located only one case that mentions the tipping of DJs at an adult nightclub: *Clincy v. Galardi South Enterprises, Inc.*, No. 1:09-CV-2082-RWS, 2011 U.S. Dist. LEXIS 100440, at *1-2 (N.D. Ga. Sept. 7, 2011).  But the *Clincy* court only addressed whether the dancers were independent contractors or employees and did not reach the DJ question presented here.  *Id.*  Moreover, in *Clincy*, the dancers were required to tip the DJs and the DJs then passed 40% of the dancers' tips to the owners.  *Id.* at *35, 36 n.7.

dancer's tips would be consistent with the policies underlying the FLSA and its regulations.   Furthermore, the parties are well represented by counsel, who are experts in the field of employment law and who are in a position to perform the necessary research and explain their respective views on the policy implications of their interpretations of the regulation.   The absence of cited authority leads the Court to conclude that there is none.

The policies underlying the FLSA do not resolve the question.   The adoption of an employment test of "striking breadth" in FLSA cases strongly suggests a congressional intent to capture more workers within the FLSA definition of employment. *See Darden*, 503 U.S. at 326.   But here, as the parties have presented the issue; the question is not how to classify the workers, but rather how to classify the tips.   From the Court's perspective, there are no obvious reasons why an employer, who has legally structured its business with both independent contractors and employees, could not allow the independent contractors to tip the employees if the employees are rendering the independent contractors a valued service.   Although the statute is remedial, the Court is chary about making a policy judgment in the guise of interpretation, especially where the Plaintiffs are not claiming they were underpaid but only that the payments do not count for FLSA purposes.   Absent greater clarity, the Court is not prepared to rule that independent contractors within a business cannot tip employees for purposes of the FLSA.

Finally, the Court stresses that the facts in this case do not suggest that VCG, for purposes of this case, has fabricated the services the emcees provide the

entertainers.  The Plaintiffs and VCG agree that entertainers rely on emcees to promote them, to set the overall mood of the clubs, to rotate them throughout the clubs, to introduce them as they take stage, to select and play energizing music, to control the lights, and generally to galvanize the crowd.  They also agree that an emcee's performance affects the entertainer's tips.  Thus, the record the parties developed in this case demonstrates that the entertainers have good reason to voluntarily tip the emcees.

In short, absent a clearer statutory or regulatory directive or evidence that the remedial purpose of the law is being violated, the Court is not inclined to impose a judicial restraint on the way an employer may structure its business.

### b.   Other "Tip" Components

The regulatory definition of "tip" contains a number of other requirements: 1) a "gift or gratuity"; 2) in recognition of "some service"; 3) "performed for [the customer]"; 4) "determined solely by the customer"; and 5) who retains "the right to determine who shall be the recipient of the gratuity."  29 C.F.R. § 531.52.  Here, the parties seem to agree that, if the regulation otherwise applies, the payments from the entertainers to the emcees qualify as tips.  For example, there is no evidence in this record that the money given to the emcees by the entertainers was anything other than voluntary.  *See ABC/York-Estes Corp.*, 1997 U.S. Dist. LEXIS 6874, at *15-20 (discussing the difference between a tip and a service charge for exotic dancers).  The Plaintiffs' and VCG's versions of the facts confirm that the entertainers determined whether and how much to give the emcees and that the

emcees performed a service to the entertainers.  The Court accepts these versions for purposes of the motions and concludes that the tipping arrangement between entertainers and emcees otherwise meets the requirements of § 531.52.[67]

### 5.   Conclusion as to the FLSA

Given the parties' agreement that the entertainers are independent contractors, the Court concludes that the amounts of money the dancers gave to the emcees constitute tips under the FLSA and that VCG is therefore entitled to a credit for those payments.

### C.   State Minimum Wage Law

VCG argues that the Plaintiffs' state law claim should fail for the same reasons as their federal claim.[68]  The Plaintiffs also acknowledge that "there is no substantial difference" between the FLSA's requirements and those of Maine's minimum wage statute.  *Pls.' Opp'n* at 9.  However, neither side provides much by way of argument or citation in support of their positions on the alleged state law violations, presumably because there are no relevant Maine state cases addressing

---

[67] The parties have argued whether the arrangement between entertainers and emcees meets the regulatory requirements of a tip pool.  29 U.S.C. § 203(m); 29 C.F.R. § 531.54.  Having concluded that the tips from the dancers to emcees fall within the regulatory definition of "tip," it is unnecessary to address whether they would fall within the regulatory definition of a tip pool

[68] VCG also cites case law in support of its seemingly contradictory statement that, although Plaintiffs are entitled to pursue claims under both the FLSA and equivalent state law, they may not "circumvent the exclusive remedy prescribed by Congress by asserting equivalent state claims in addition to the FLSA."  *Def.'s Mot.* at 18 n.12 (citing *Roman v. Maietta Constr.*, 147 F.3d 71, 76 (1st Cir. 1998)).  However, this argument operates to prohibit a plaintiff from receiving double recovery on a state law claim where he or she *recovers* under the equivalent FLSA claim.  *See, e.g., Bolduc v. Nat'l Semiconductor Corp.*, 35 F. Supp. 2d 106, 117 (D. Me. 1998) (noting that, while "[r]ecovery under both a federal and state statute for the enforcement of the same right is clearly prohibited," a plaintiff is "entitled to pursue [minimum wage] claims under both state and federal law to vindicate the same right").  Because the Plaintiffs' FLSA claims fail, there is no such risk of double recovery here.

the specifics of tipped minimum wage.  Furthermore, VCG itself contends that there are definitional differences between federal and Maine law.  *Def.'s Opp'n* at 13-15.

The Plaintiffs' state law claims are before this Court pursuant to the Court's supplemental jurisdiction.  28 U.S.C. § 1367.  Where a district court has dismissed all claims over which it has original jurisdiction, it may decline to exercise supplemental jurisdiction over the remaining state law claims.  28 U.S.C. § 1367(c)(3).  The First Circuit generally assumes that once all federal claims are resolved, the state claims should be dismissed.  *See, e.g., Batterman v. Leahy*, 544 F.3d 370, 376 (1st Cir. 2008) ("if the federal claims were disposed of on the papers, the district court would likely decline to exercise pendent jurisdiction over the state-law claims").  Accordingly, the Court dismisses, without prejudice, the Plaintiffs' state law claims in Claim Two of the Plaintiffs' Complaint.

## V.   CONCLUSION

The Court GRANTS Defendant VCG Holding Corporation's Motion for Summary Judgment as to Claim One of the Complaint and DISMISSES WITHOUT PREJUDICE Claim Two of the Complaint (Docket # 46); the Court DENIES Plaintiffs' Motion for Partial Summary Judgment (Docket # 44).; the Court DISMISSES as moot the Plaintiffs' appeal of the Magistrate Judge Decision (Docket # 59).  The Court ORDERS the Clerk to enter Judgment in favor of VCG Holding Corporation and against the Plaintiffs.

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
CHIEF UNITED STATES DISTRICT JUDGE


Dated this 9th day of March, 2012